# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 9, 2014 Session

## STATE OF TENNESSEE v. KENNETH PAUL COLVETT

**Appeal from the Circuit Court for Marshall County**
**No. 2012-CR-64     F. Lee Russell, Judge**

---

**No. M2013-02488-CCA-R3-CD - Filed December 19, 2014**

---

Following a jury trial, the Defendant, Kenneth Paul Colvett, was convicted of premeditated first degree murder and sentenced to life imprisonment with the possibility of parole. See Tenn. Code Ann. § 39-13-202. In this appeal as of right, the Defendant contends (1) that the jury erred by rejecting the defense of insanity; (2) that the trial court erred by not allowing defense counsel to take home prior written statements made by a witness and by not admitting extrinsic evidence of the statements of two witnesses during trial; (3) that the State failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83 (1963); (4) that the trial court erred by refusing to provide the Defendant with a transcript of a prior hearing in this case; (5) that the State committed prosecutorial misconduct during the cross-examination of the Defendant's expert witness; (6) that the trial court erred by questioning the Defendant about his decision not to testify at trial; (7) that the State committed prosecutorial misconduct during its closing argument by commenting on the Defendant's decision not to testify; and (8) that the Defendant is entitled to a new trial based upon cumulative error.[1] Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Walter W. Bussart, Lewisburg, Tennessee (at trial and on appeal); and Jason Charles Davis, Lewisburg, Tennessee (at trial), for the appellant, Kenneth Paul Colvett.

---

[1]For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert Carter, District Attorney General; Weakley E. Barnard and Michael David Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND[2]

*I. Evidence Regarding the Offense*

This case arises from the murder of the Defendant's wife, Kay Clark Colvett, during the evening of April 7, 2012. At trial, the victim's daughter, Jennifer Coward, testified that her mother and the Defendant had been married for approximately three years and that they both had adult children from previous relationships. The victim owned several rental properties and worked as a nurse who "sat with old people." Ms. Coward testified that she was close to her mother and spoke to her several times a day.

Ms. Coward testified that she went to the victim's house on April 5, 2012, to visit with her. At some point that morning, the victim needed to move her car, but her car keys were missing. The victim then noticed that her cellular telephone and its charger were missing as well. Ms. Coward testified that the victim "looked all over the house" and "started crying." According to Ms. Coward, the victim "was really hurt" and "didn't know what to do." The victim was scared that the Defendant had taken her keys and cell phone. The victim told Ms. Coward that on April 9, 2012, she "was going to move in with" Ms. Coward and leave the Defendant. The victim said that she "didn't want to . . . argue any more" with the Defendant. Ms. Coward was unsure if the Defendant knew about the victim's plan to move out.

Ms. Coward testified that she next saw the victim on April 7, 2012. The Defendant and the victim dropped off a birthday card for Ms. Coward's son that afternoon. The two did not stay long and did not come inside Ms. Coward's house. Ms. Coward testified that everything seemed "basically okay" and that there was nothing unusual about the Defendant that afternoon. Later that afternoon, the victim called Ms. Coward. Ms. Coward testified that the victim sounded "real sharp" and "maybe a little bit scared." The victim told her that the Defendant had said "that he was going to pen [sic] [the victim] up underneath a white house." Ms. Coward told the victim she would call her back and hung up.

---

[2]This section will discuss only the factual background regarding the Defendant's conviction. The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

The victim immediately called Ms. Coward back and repeated what the Defendant had said. Ms. Coward took the Defendant's comment to mean "that he was going to kill" the victim and bury her "underneath the white house." Ms. Coward testified that she spoke to the victim again later that afternoon. Ms. Coward called the victim to ask "how things were going," and the victim said that she and the Defendant "were fixing to grill out and after [the Defendant] had got something to eat, she thought he would be fine." Ms. Coward testified that the next day was Easter and that she and the victim had made plans for an Easter dinner at the victim's house.

The victim's other daughter, Rhonda Gooch, testified at trial that she was not as close to the victim as Ms. Coward but that she spoke to the victim several times a week. Ms. Gooch testified that on April 6, 2012, her daughter was playing in a softball tournament. Ms. Gooch saw the Defendant and the victim at the tournament. Ms. Gooch testified that they both seemed to be in "a good mood" and happy. Ms. Gooch described the Defendant and the victim as "cutting up with each other" and laughing. Ms. Gooch testified that the victim did not say anything that day about leaving the Defendant or moving in with Ms. Coward.

The next day, Ms. Gooch and her daughter went to the victim's house after the second day of the softball tournament had ended. Ms. Gooch explained that her daughter "wanted to play a joke" on the victim. Ms. Gooch also wanted to ask the victim "what [she] needed to bring" for Easter dinner. Ms. Gooch testified that they arrived at the victim's house around 5:00 p.m. and knocked on the back door. According to Ms. Gooch, the victim answered the door in a towel and said she had been in the bedroom with the Defendant. Ms. Gooch spoke briefly to the victim and found out what she needed to bring and when to be at the victim's house for Easter dinner. Ms. Gooch testified that when she and her daughter left the victim was in a good mood and seemed happy.

James Colvett[3] testified that he is the Defendant's cousin and lived in Mount Pleasant, Tennessee, some thirty to forty minutes away from the Defendant's home. James testified that he had worked with the Defendant in the past but that he was not very close to the Defendant and had never been to the Defendant's house. James recalled that prior to April 2012, the Defendant had called and left a message that he "was having trouble" with the victim and that "it would probably wind up in a divorce." The Defendant then left James a message on April 3, wanting to see him. On April 7, 2012, the Defendant called James around 3:00 p.m. but did not leave a message.

---

[3]Because the victim, the Defendant, and several of the witnesses share the same last name, we will refer to some of the witnesses by their first names. No disrespect is intended.

James testified that the Defendant showed up at his house around 8:00 p.m. that night. According to James, the Defendant told him that he was "going to be rich" and asked him to help remodel "some houses." The Defendant also told James that the Tennessee Bureau of Investigation (TBI) "had ran [sic] him up and down the streets of Alabama all day." The Defendant explained to James that the TBI wanted "answers, but [he was] not telling them." The Defendant also told James that his employer was thinking of promoting him to "plant manager" but that "some people at work" were trying to prevent the promotion.

The Defendant then asked James "to help him clean up some blood" at the Defendant's house. The Defendant told James that he had killed "a lady he knew that knew a lot about real estate" and that he had been waiting to kill her "until he learned what she knew about real estate." The Defendant said that he had taken "a knife and started cutting" but that the knife was dull so "[h]e got another one." James testified that the Defendant told him that the body "was laying [sic] close to a door and [they] could move it a little bit." The Defendant planned to "drive in" and get the body in his truck. The Defendant wanted James to clean up the blood while he hauled the body away. The Defendant also told James that he wanted to lure his daughter, his son-in-law, and "some other people" to his house to "show them what he had done."

James testified that the Defendant left around 8:20 p.m. According to James, the Defendant was clean and dressed in t-shirt and blue jeans. However, James testified that the Defendant "never stopped" talking while he was there and that he would go from "one subject to the next, but you don't know where something is starting and something is ending." James testified that he thought the Defendant was "not on his medication" and "[o]ut of touch with reality." After the Defendant left, James called some of the Defendant's relatives and told them about his behavior that night. Eventually, one of the Defendant's relatives called the Lewisburg Police Department (LPD) to request a "welfare check" on the Defendant.

Steve Sanders testified that on April 7, 2012, he was a Corporal in the LPD and received a dispatch to perform a welfare check on the Defendant around 10:00 p.m. Cpl. Sanders testified that he was told the Defendant "had reportedly made threats to harm or kill his psychiatrist." When Cpl. Sanders arrived at the Defendant's house, he was able to see into the house through the front windows. Cpl. Sanders saw that the lights were on inside the house, but he did not see anyone inside. Cpl. Sanders also did not hear any noise while he approached the house. When he knocked on the front door, Cpl. Sanders saw the Defendant walking down a hallway with a pair of keys in his hand. The Defendant was the only person Cpl. Sanders saw in the house.

-4-

Cpl. Sanders testified that when the Defendant answered the door, he was wearing a dress shirt tucked into khaki pants. Cpl. Sanders further testified that the Defendant was "groomed" and that he did not see any blood on the Defendant or his clothes. Cpl. Sanders also testified that he did not see any blood inside the Defendant's house. Cpl. Sanders told the Defendant why he was there and asked the Defendant if he "had harmed anybody." The Defendant responded, "No." Cpl. Sanders then asked the Defendant if "he had harmed himself or had any thoughts of harming himself." The Defendant again responded, "No." Finally, Cpl. Sanders asked the Defendant if "he had any intentions of harming anybody" or if he had made any threats. The Defendant said, "[N]o, he was just sitting in his chair trying to relax." Cpl. Sanders testified that the Defendant answered his questions without hesitation and made eye contact with him. Cpl. Sanders testified that he was satisfied with the Defendant's answers and concluded the welfare check.

At approximately 1:30 a.m. on April 8, 2012, the Defendant went to the Lewisburg Walmart. Surveillance video from the store was played for the jury during the trial. The Defendant drove a white pickup truck and parked in the back of the parking lot. The Defendant was wearing a white t-shirt and black jeans. The Defendant waited in the checkout line and purchased sponges, two mops, and bleach. The Defendant then walked back to his truck and drove away. There was nothing odd or unusual about the Defendant's behavior on the Walmart surveillance video.

Around 11:00 a.m. that morning, Ms. Coward, along with her husband and her son, went to their church for an Easter service. When they arrived, the Defendant was there, but the victim was not. Ms. Coward testified that this was unusual because the victim was "a pretty frequent attender" of the church. Ms. Coward sat down next to the Defendant and asked him about the victim. The Defendant told Ms. Coward that she was "at home, sick." The Defendant then said, "Oh, yeah, we won't be having Easter." Ms. Coward testified that the Defendant was dressed "appropriately for church" wearing brown slacks, a dress shirt, and a tie. Ms. Coward also testified that the Defendant slept through most of the service. When the service was over, the Defendant "left really quick." Ms. Coward testified that she thought this was odd because the Defendant and the victim would typically linger after church to speak to their friends.

After church, Ms. Coward tried calling the victim's home and cell phones, but the victim did not answer. Ms. Coward, her husband, and her son then went to the victim's house. The Defendant was already there when they arrived, and the victim's car was parked in the garage. Ms. Coward went inside the house and went through the house looking for the victim. When Ms. Coward asked the Defendant where the victim was, he said she was at a neighbor's house. Ms. Coward saw the victim's purse and cigarettes on the kitchen counter. Ms. Coward testified that this was unusual because the victim "always had those items with

her." As she went through the house, Ms. Coward noticed in the master bedroom that only one side of the bed appeared to have been slept in and that the sheets were missing from the bed in the guest bedroom.

Ms. Coward's husband, Jon Coward, testified that after Ms. Coward had gone through the house, the Defendant asked him if he would "ride . . . around the neighborhood to look for" the victim. Mr. Coward testified that he and the Defendant took the Defendant's truck and drove around the neighborhood for ten to fifteen minutes with the windows down while the Defendant "call[ed] her name out." Unable to find the victim, they returned to the victim's house. Ms. Coward testified that they decided to go out to eat lunch. The Defendant wrote a note for the victim stating where they were going and asking her to call them.

Ms. Coward testified that the Defendant slept while they drove to lunch and that he did not eat very much at the restaurant. Mr. Coward testified that during lunch, the Defendant said that the TBI and his daughter were "trying to kill" him and that he "needed to kill [his daughter] before she had him killed." Ms. Coward asked the Defendant if he wanted to bring some food back for the victim and he said no. Ms. Coward testified that the Defendant slept during the drive back to the victim's house. Mr. and Ms. Coward testified that the Defendant's sleeping at church and in the car was not unusual because the Defendant "slept all the time."

When they got back to the victim's house, the Defendant asked Ms. Coward to "call the TBI." Ms. Coward told the Defendant that she could not because it was Sunday. The Defendant then told Ms. Coward he would give her $1,000 if she would write a statement to the TBI for him. Ms. Coward testified that she could not recall what she wrote down for the Defendant. As this was happening, Mr. Coward went to the kitchen sink to wash his hands. At the sink, Mr. Coward noticed "a fine mist" of blood spatter on the kitchen counter. As he looked closer he saw, "it was on the curtains, the window, [and] the side of the refrigerator." Mr. Coward showed the blood to Ms. Coward, and she called Ms. Gooch.

Ms. Gooch testified that Ms. Coward was "frantic" when she called and told her about the blood in the victim's kitchen. Ms. Gooch went immediately to the victim's house. Ms. Gooch testified that she saw blood spattered "on the curtains, the window[,] . . . [t]he side paneling of the cabinet next to the sink, and the cabinets up underneath the kitchen sink." Ms. Gooch "went through the house hollering for" the victim. Ms. Gooch then asked the Defendant where the victim was and the Defendant "just looked at [her] and shook his head . . . [a]s if saying he didn't know." After going through the house, Ms. Gooch called the police and went outside.

Ms. Gooch testified that there was a shed behind the victim's house where the Defendant and the victim kept yard tools and other items. Ms. Gooch further testified that she had a key to the shed because she would do lawn work for the victim and the Defendant. When Ms. Gooch went to open the shed, she found that the padlock on the door had been changed and that her key no longer worked. Ms. Gooch also noticed that there was a towel hung by duct tape covering the shed's only window. Ms. Gooch testified that she went back inside the house and asked the Defendant where the keys to the shed were but that he did not answer.

Corporals John Christmas and Tracy Teal of the LPD were the first officers to arrive at the victim's house on April 8, 2012. Cpl. Christmas testified that they arrived around 3:30 p.m. Ms. Coward, the Defendant, and Mr. Coward were in the driveway while Ms. Gooch was by the shed. After speaking to Ms. and Mr. Coward, Cpl. Christmas asked the Defendant if he knew where the victim was. The Defendant responded that he did not know where the victim was and "that he hoped that [the officers] could find her because they had sure had some good times together." Cpl. Teal asked the Defendant if they could enter the house and the Defendant responded, "Sure, come on in."

Cpl. Teal testified that in the kitchen he saw "a few knives in the sink" and "blood spatter on the kitchen cabinets, curtains, and windows." Cpl. Teal asked the Defendant if he had "checked with the local emergency rooms," and the Defendant said that he had not. Cpl. Teal stepped outside and called the local hospitals to see if the victim had been admitted at either of them. While Cpl. Teal did this, Ms. Gooch asked Cpl. Christmas to check the shed. Cpl. Christmas asked the Defendant where the keys to the shed were. The Defendant told Cpl. Christmas that the keys were "in a closet in an office area of the house." Cpl. Christmas testified that he went with the Defendant to get the keys and that the Defendant said they were "in a pair of shorts in the closet on a shelf."

At the same time, Cpl. Teal learned that the victim was not at either of the local emergency rooms. Cpl. Teal then "asked everybody to vacate the house." When Cpl. Teal did this, Cpl. Christmas told the Defendant not to "worry about the keys" and to exit the house. The victim's family was upset and started "making accusations" about the Defendant. Cpl. Teal asked the Defendant to sit in the back seat of the patrol car, and the Defendant complied. The Defendant was not handcuffed, and Cpl. Teal rolled the window down so the Defendant could get out of the car if he wanted to. Cpl. Teal told the Defendant that he did not want the Defendant to feel like he was "being incarcerated." Video from the patrol car was played at trial. In the video, the Defendant sat calmly in the backseat, occasionally blinking his eyes and looking around.

Cpl. Christmas then asked the Defendant to step out of the patrol car so he could ask him some questions about the victim. The Defendant was able to give biographical information about himself, the victim, and their families. The Defendant told Cpl. Christmas that he last saw the victim at 9:40 a.m. that morning and that she was still in bed when he left for church. The Defendant said that the victim complained she had a stomach virus but that she was planning on having Easter dinner at 2:00 p.m. When asked if he and the victim had argued recently, the Defendant responded that they had the night before. The Defendant said, "Well, she'd been running through the house chasing me some and using psychology on me." Cpl. Christmas asked the Defendant what he meant, and the Defendant responded, "Trying to mix my thoughts up. Going round from room to room. She'd do that sometimes and sometimes she'll sit down." The Defendant explained that they had been in an argument "concerning that" in the last week.

Cpl. Christmas asked the Defendant if there had ever been a report of domestic violence at the house, and the Defendant admitted that he had "an assault charge on domestic violence" the previous year but said they were only "arguing." Cpl. Teal then asked the Defendant if they could search the shed. The Defendant said they could, and Cpl. Teal asked where the keys were. The Defendant told Cpl. Teal that the keys were in the office closet. Then the Defendant said, "You all might as well go ahead and handcuff me" and put his hands behind his back. Cpl. Teal asked, "Why's that, is [the victim] in there," and the Defendant responded, "She's in there, go ahead." Cpl. Teal asked, "What's wrong with her," and the Defendant responded, "She tried to kill me using psychology and reverse psychology." The Defendant was asked again what was wrong with the victim, and he responded, "She works for the TBI." Cpl. Christmas asked the Defendant, "How long [had] she been in there," and the Defendant responded, "A couple of days."

At that point, Cpl. Teal stopped the Defendant and told him not to say anything else until he had been read his rights. The Defendant was handcuffed and placed in the backseat of the patrol car. The Defendant was asked again where the keys to the shed were, and he told the officers that they were in the pocket of a pair of shorts in his office closet. Cpl. Christmas testified that the Defendant seemed to understand all of his questions, cooperated with him, answered his questions appropriately, and made eye contact when speaking to him. Cpl. Christmas went back into the house and retrieved the keys to the shed. Cpl. Christmas testified that the keys were where the Defendant said they would be.

While Cpl. Christmas was getting the keys, the Defendant said to Cpl. Teal, "Now, my wife and me was in bed having sex and I can tell you the whole thing." Cpl. Teal told the Defendant not to say anything until a detective could speak to him. Cpls. Christmas and Teal then unlocked the shed and saw the victim's body lying "on the floor." Her body was "partially clothed" and wrapped "in a blanket or comforter" bound by "rope or twine." The

body was "face up," and "[t]here was discoloration" of the body. Cpl. Christmas also testified that "[t]here was blood [and] [a]pparent stab wounds." The Defendant was then transported to the local police station by LPD Officer Kevin Clark. Officer Clark testified that while he was with the Defendant, there was nothing "peculiar or bizarre" about the Defendant's behavior.

Detective Sergeant David Henley of the LPD testified that he arrived at the victim's house shortly after the Defendant had been taken to the police station. Det. Henley testified that he searched the house as well as the shed and collected several pieces of evidence. No identifiable finger prints were found on any of the items collected by Det. Henley. Det. Henley observed and photographed blood spatter, a pattern of blood "usually from some type of injury," in the kitchen. Det. Henley testified that there was blood spatter on the refrigerator, the stove, the back splash behind the stove, the dishwasher, the kitchen cabinets, the window frame and curtain, the door leading from the kitchen to the garage, the door frame "on the floor of the garage," and "the door casing that led to the living room." Det. Henley also found "a small blood droplet" on "the metal security door" leading to the back patio.

In the kitchen sink, Det. Henley found "a large kitchen knife submerged in water" along with some other dishes. Subsequent forensic analysis by the TBI revealed the presence of blood on the knife, but the blood did not belong to either the Defendant or the victim. Det. Henley testified that he found a plate of food on the dinning room table and that he thought it was "odd . . . to find a meal on the table" after seeing all the blood in the kitchen. Det. Henley found a "black plastic trash bag" in the closet of a bedroom used as an office. Inside the trash bag was a "blood-soaked towel, a mop head[,] . . . some sponges," and "other pieces of trash and some empty water bottles." Det. Henley testified that everything in the bag was "[v]ery wet." Subsequent forensic analysis by the TBI revealed the presence of blood on the towel, mop head, five wash cloths, and a Walmart bag found in the garbage bag. The Walmart bag and two of the wash cloths tested positive for the victim's DNA.

Det. Henley found a pair of black jeans and a gray t-shirt "on the office chair in the office." In the bathroom, Det. Henley found red stains on the faucet handles of the sink. Subsequent forensic analysis by the TBI revealed that the handle labeled "hot" had the victim's blood on it. In the guest bedroom, Det. Henley found that there were "no comforters, no quilts, no sheets" on the bed. Det. Henley also found in the guest bedroom a spinning wheel with a "green fiber rope" on it. In the living room, Det. Henley found a Walmart receipt for the purchase of cleaning supplies. Det. Henley testified that he found a wet towel on the floor of the laundry room and "a pair of black jeans, t-shirt, and some other clothing" in the dryer. Det. Henley also observed that the washing machine appeared to have been recently used.

In the garage, Det. Henley found a pair of "rubber boots on top of [a] gun cabinet." Det. Henley testified that the boots were "very clean" and did not appear to have "been sitting on top of the gun cabinet for a long time." Det. Henley also noted that the kitchen floor was clean and that there was no blood on it. Det. Henley testified that the concrete steps leading from the door to the back patio were "exceptionally clean." Det. Henley further testified that the grass from the patio to the door of the shed "was bent towards . . . the shed, kind of like a trail." Det. Henley noted that the bricks used as steps to the door of the shed appeared to have been cleaned and that the lock on the shed looked new.

Inside the shed, the victim's body was lying near the door of the shed with the head pointing toward the door. The victim's body "was wrapped in bedding" that was tied "to the body" at the ankles and knees "with what appeared to be the same green fiber rope" that was found in the guest bedroom. The victim's shirt was "rolled up . . . [t]oward her shoulders," suggesting to Det. Henley that her body was "drug feet first" from the back patio to the shed. Det. Henley testified that he also found "a towel and a pillow case . . . hung above the window" inside the shed. The victim's body was removed from the shed and taken to the medical examiner for an autopsy.

Doctor Adele Lewis, an expert in forensic pathology, testified that she performed an autopsy on the victim's body. Dr. Lewis opined that the victim's cause of death was "multiple sharp and blunt force injuries." Dr. Lewis testified that the victim suffered "multiple blunt force injuries to her head." According to Dr. Lewis, there was "a large area of bruising over the left side" of the victim's head, two cuts over her left eyebrow, and "bleeding into her left eye." On the right side of the victim's head there were "multiple line-shaped bruises." Dr. Lewis opined that these injuries were "consistent with having been struck in the head . . . with a fist."

Dr. Lewis testified that the victim also suffered "numerous sharp force injuries to her body." There were a total of fifty-two stab wounds to the victim's torso over her chest, abdomen, hips, and back. Dr. Lewis testified that some of these stab wounds were superficial while others were significant and caused injuries to the victim's lungs, intestines, right kidney, pancreas, and liver. The victim also suffered stab wounds to her left arm, left wrist, and right wrist. Dr. Lewis testified that the victim further suffered bruises and scrapes to her right and left arms. Dr. Lewis opined that the injuries to the victims arms and hands were consistent with having been "defensive-type wound[s]." The victim also had an injury to her back consistent with her body having been dragged after death.

While Det. Henley searched the victim's house, LPD Detective Scott Braden interviewed the Defendant at the police station. Det. Braden's initial interview with the Defendant was recorded and played for the jury at trial. Det. Braden advised the Defendant

of his constitutional rights and reviewed a waiver form with the Defendant. The Defendant waived his rights and signed the waiver form. Det. Braden asked the Defendant if he was on any medication. The Defendant responded that he took lithium "for bipolar" and that he had taken some at 8:00 a.m. that day. The Defendant was able to answer clearly and concisely biographical questions about himself, the victim, his family, and her family.

Det. Braden asked the Defendant if he knew why he had been arrested. The Defendant responded by telling Det. Braden about an incident that occurred the previous May when he had been admitted to a hospital for psychiatric treatment because the victim had "lied" and said his "medicine was off." Det. Braden then asked the Defendant about what happened with the victim. The Defendant told Det. Braden that the victim was an assassin working with the TBI as part of a conspiracy to kill him.

The Defendant stated that everything began when he met two or three TBI agents at a local bar and agreed to work as an informant. However, a few weeks later, one of the TBI agents "started stroking [his] penis" and told him "that's part of law enforcement." The Defendant claimed that he then refused to help the agents any more and that they threatened that they were "sending somebody after" him to kill him. The Defendant also claimed that he was told by several people that he was going to be killed because he was "too smart to be in law enforcement."

The Defendant told Det. Braden that he met the victim at his church and that he knew she was part of the TBI conspiracy to kill him. The Defendant explained as follows:

> I worked with her so hard because I was told that she was trained better than anybody else in the TBI and they was going to send her after me. And I kept that thought to myself, and I thought that if her and me got together that we'd have the best sex in the world. And as long as she wouldn't doing them mind games we did. It was something else.

The Defendant claimed that the victim "trained" others "in law enforcement," including his ex-girlfriend, Patsy McFarland. The Defendant told Det. Braden that the victim had told him she was retired from "law enforcement," but "she'd [still] mess with" him.

The Defendant explained to Det. Braden how the victim would "mess with [his] head":

> She would start messing with my head. She's been doing this for awhile. We'd have sex two or three nights a week then she wouldn't let me have none for two or three nights, just messing with my head. And some nights, when I

be really tired, she would try to get me to think about the white house with a green valley and I'd tell her, "Don't do that, Kay. I might quit breathing." That's what the TBI uses with their assassins to try to kill somebody. If you don't close your eyes, fast, and blink with your left eye, it will kill you 'cause your heart will slow down. And she tried that with me for hours.

The Defendant explained further how the victim would "mess with [his] head":

[The victim would] start trying to mess with my head, confuse me on my thoughts. Start yelling, walking up and down the hall. Sometimes she'd get knives and put them in her bed, lay down with them in bed. Walk up to me with a knife in her hand, look at me, and I got to where I'd look her right in the eyes . . . I reckoned she [was] just playing with me, but I watched her.

When asked how long and how often the victim had "mess[ed] with [his] head," the Defendant stated that it had occurred throughout his relationship with the victim. The Defendant explained further,

Sometimes she would start in two or three nights of being with me in the bedroom . . . I begged her to stop, she went wild and crazy. The way we had sex, it was worth more to me than any amount of money. We could talk thirty or forty minutes about something and still be having sex. That's how she'd erase your mind. I had to watch her when she started that stuff. Sometimes I had to . . . wink right quick.

The Defendant also claimed that the victim's "mind control" was so strong she "could look at your d--k and make it dance up and down" and that he was scared of her power.

The Defendant told Det. Braden that the victim and his ex-girlfriend, Ms. McFarland, "worked together" and that Ms. McFarland would "come running" if the victim told her to. The Defendant explained that when he was arrested the previous May, he was afraid that the victim and Ms. McFarland were "going to gang up" on him. The Defendant stated to Det. Braden,

Kay told me the night I was arrested . . . "It's all over for you now, Pat is on the way." And knowing what Pat can do in psychology and slowing your heart down and what Kay could do, I was pacing the floor, sweating, wanting to jump out the window, wanting to just run like crazy down the street. Next thing I know, I couldn't even hardly talk. I don't know why they do me like that.

-12-

Despite this, the Defendant stated that he "wanted to keep [the victim] because she was the best lover [he] ever had" and because he was "a Christian [and] . . . didn't want to go to Hell for adultery." The Defendant told Det. Braden that the victim was very smart and knew a lot about the "business world" and "real estate" because her parents were millionaires. The Defendant believed that if he and the victim could join together, they could make millions of dollars in "real estate" and rental properties. The Defendant stated that he repeatedly told the victim that "[r]egardless [of] what the TBI [had] paid [her] to kill [him], [she] could have more money with [him]." The Defendant told Det. Braden that telling the victim this would cause her to stop "mess[ing] with [his] head" for "two or three days and then [she would] start right back doing it."

The Defendant told Det. Braden that, before the murder, he was driving with the victim when "she got [him] so relaxed [he was] trying to keep from falling out of the seat." The victim asked him to have sex, and he said he could not because he would die. Then the victim said she was "gonna give [him] a blowjob" that night, and he knew "she was trying to set [him] up." The Defendant told Det. Braden that despite his concerns he got the victim "to talk to [him], to save [his] life" and that he liked "her that way, but she [was not] always that way."

The Defendant said that on Thursday, April 5, he got off from work early and went home to spend time with the victim. The Defendant told Det. Braden that they "laughed and cut up and talked and had a good time." The Defendant said that he "had a lot of sex" with the victim on Thursday night and that her "eyes [were] glowing and [he] thought [he had] gotten through to her." The Defendant said that he and the victim also "had a great time" on Friday and Saturday. The Defendant told Det. Braden that he was unsure if the murder happened on Friday or Saturday because the victim "was messing with [his] head so much [he could] hardly remember what day it [was]."

The Defendant told Det. Braden that things changed when he and the victim were interrupted during sex by a knock on the door. The Defendant stated that Ms. Gooch and her daughter came into the house and were "laughing, cutting up, and talking" even though he told the victim to tell them not to. After they left, the victim got "in one of her moods again, walking up and down the hallway, looking back and forth, and twisting around right quick and fussing at" him. The Defendant said that the victim was trying to get "in [his] head using that psychology and reverse psychology and strategy." The Defendant explained that she was "trying to mess [him] up, just left and right, left and right."

Det. Braden asked the Defendant what he meant by "reverse psychology" and the Defendant responded,

-13-

When you stick it to one word and you got your mind on it, she'll reverse to another word and by the time you get it here she'll reverse it to another one. Just back and forth, back and forth, different words. And then she'll start with the strategy and then she'll start back with the psychology.

The Defendant said that he was naked and that the victim "was on the floor when she started it," and then she "got to just stomping." The Defendant continued, "Then she spins around and starts it, then points her finger at me, and then raises her head back and yells at me and then she won't let up." The Defendant said that the victim "start[ed] talking that crazy talk." When asked what the victim said, the Defendant stated the following:

[The victim said,] "Aw, you don't know nothing. You always think you're smarter than me. You shouldn't talk to me that way. You're really messing me up in my head. You always do that to me. I don't understand it and you keep on and on with it." Then she started throwing different things and bouncing around that psychology and strategy and I wouldn't doing nothing she said.

The Defendant told Det. Braden that the victim went "on and on and on." The Defendant continued as follows:

I asked her to stop and she don't have to do that with me. I said, "Kay, I have heard about you for many years and knowing law enforcement was going to send you after me, I thought about what I could do to have you as a wife because you was such a good lover." I said, "If the TBI offered you a million dollars to kill me, you could have more money with me than what they offered you. Don't do that. Please, please." And I was nearly screaming, begging her not to do it, shaking, crying, 'cause I was afraid of what I might could do and I knew I was going to have to do it if she come at me because she would not have let up if she had one split second to get in my head, she would have killed me and I'd of fell to the floor. That's how good she is.

The Defendant said that he begged the victim not to kill him with "psychology" and that he warned her that he had learned "psychology, reverse psychology, and strategy" in "law enforcement," but that he had never killed anyone with it. The Defendant said he had only "played mind games on people trying to do the trance on [him]." The Defendant told the victim that he did not "want to live with the fact that [he had] killed [her]." The Defendant told Det. Braden that the victim started smiling and that he thought she had stopped, but he knew he had "said the wrong thing because she was looking around to see

-14-

if the curtains was closed and [he] knew what she was doing, [he] knew she was setting [him] up."

The Defendant told Det. Braden that he ran into the kitchen and got a knife to kill the victim when he saw her "eyes rolling around in her head and [he knew] she was fixing to hit [him] with psychology and strategy." The Defendant further explained to Det. Braden:

> I'm a good person. I wouldn't kill nobody for nothing and I begged, I begged her a long time. But when them eyes leaned back and she looked at me serious I said, "Kay, I hate to do this, I'm gonna miss you, but I'm gonna send you straight to Hell right now."

The Defendant said that the victim was near the stove trying to run away from him. The Defendant told Det. Braden that he was naked with the knife in his left hand and that he "jumped up in the air like a wild animal and [he] jumped on [the victim's] back." The Defendant then "got to beating her in the face with [his] fists and her head, cutting on her, beating on her." The Defendant said that he had the "knife in [his] left hand and [his] right hand pounding her face and everything and switching back and forth." The victim was screaming and crying as the Defendant attacked her. The Defendant said that he "cut [the victim] bad" all over her body because he was "afraid that if [he had] let up on her she[ was] going to kill [him]."

The Defendant told Det. Braden that he did not let the victim get back up and that he knew everything he did "had to be precise." During the attack, the Defendant said to the victim, "You're not going to get up and use psychology on me. I got you where I want you and I begged you not to let this happen." The Defendant told the victim that they could of had so much together and that all he wanted was for her "to cooperate with [him] on that and [to] give [him] a lot of sex and [not to] use [those] mind games on [him]." The Defendant told Det. Braden that the victim responded, "I wish I'd listened to you," as he stabbed her. The Defendant also repeatedly stated that he "didn't want to hurt" the victim "because [he] loved her so much" and that if there "was any way [he] could have avoided killing her [he] would not have done it."

The Defendant told Det. Braden that when he had finished stabbing the victim, he drank some water and cleaned the knife off in the kitchen sink. The Defendant said that he then "sat down in [his] chair" and cried, shook, and wished he "hadn't done what [he had] done." The Defendant said that he "cried for a long time" and regretted what he "had to do." The Defendant then moved the body and cleaned the kitchen because he was afraid Ms.

McFarland "might be coming after [him]" to kill him. The Defendant stated that he wrapped the victim's body up in "quilts" from one of their beds. He then went outside to make sure no one was looking and, because her body was too heavy to lift, he "drug her out" the back door to the shed. The Defendant told Det. Braden, "It's hard to move a body." The Defendant claimed it took him several hours to move the body. Once the body was inside the shed, the Defendant locked the doors.

The Defendant stated that after he moved the body, he started to clean up in the kitchen. The Defendant said that he took three showers that night, wore several different items of clothing while cleaning, wore rubber boots, did laundry, and went to Walmart to buy cleaning supplies. The Defendant said that he knew it looked like he was trying to hide what he did, but he really "was not trying to cover [it] up." Instead, the Defendant said he was worried that Ms. McFarland was going to come for him, and he wanted "to see how fast the [LPD] would come up with the answer." The Defendant stated that while he was cleaning, a LPD officer came to his door and asked him if he was "going after the TBI." Det. Braden asked the Defendant why he did not just tell the officer what had happened, and the Defendant said he wanted to see if Ms. McFarland was coming for him and to "set a trap" for her.

The Defendant said that he finished cleaning around 4:30 Sunday morning, and he cleaned "everything pretty good" but that he left some "blood stains" in the kitchen. The Defendant told Det. Braden that when he finished cleaning, he put the used cleaning supplies in a garbage bag and put the bag in the office closet. The Defendant said that he woke up around 7:00 a.m. and started to drive to Alabama to find someone to "watch [his] back," but that he decided to turn around and come home. The Defendant told Det. Braden that he had breakfast and then went to church. When asked about the victim at church, the Defendant said that she was at home in bed. The Defendant explained to Det. Braden, "What I was going to do is tell law enforcement what I'd done. I was trying to see if [Ms. McFarland] was going to come after me and I was wanting to call them and let them come and arrest her."

When Det. Braden asked the Defendant what he drove to church, the Defendant stopped Det. Braden to tell him about something that had made him "very upset." The Defendant told Det. Braden that after he had bought his truck, he would hear people around town say, "This is the new man that's going to be reinstated in the TBI, he's got thirty-five years' experience." The Defendant told Det. Braden that this made him mad and that he was thinking about selling his truck. The Defendant explained, "If I'm going to work in law enforcement, somebody don't need to be blowing my cover, 'cause I ain't going to blow it myself. Don't make a bit of sense."

The Defendant said that he did not tell Ms. Coward or Ms. Gooch what had happened because he wanted to see how they reacted. The Defendant said that he knew he "could make money with them" because "they acted that out like they was in a movie." The Defendant explained that they "put a lot of emotion into it . . . they got in to it." The Defendant was especially interested in Ms. Gooch because he thought he "could make millions with her" based on how she reacted to the blood spatter. The Defendant said that everyone at his house that day "was acting."

The Defendant explained to Det. Braden why he waited until the police were about to enter the shed to tell them what had happened:

> I was going to tell law enforcement where I put the body before they left, down at the house, but they was looking and I was going to see what they'd find down there and I was going to tell them what I'd done. I cleaned up the body and put it out in the shed to see if anybody else would come after me and I was going to be ready on the phone to dial the [LPD] and tell them what was going on.

The Defendant concluded the interview by telling Det. Braden that everything he had told him was the truth and that he had enjoyed their conversation. The Defendant then said, "I'm a non-violent person, but it was a life or death situation that I was in and that's why I went crazy. Just scared to death. Didn't know if somebody was coming behind me or not, that's why I went so fast."

Det. Braden testified that after he finished his initial interview with the Defendant, he turned off the audio recorder and conducted a second interview in order to produce a written statement. Det. Braden testified that he wrote the statement out for the Defendant, that he had the Defendant review the statement, and that the Defendant initialed changes to and signed the statement. The written statement presented a more condensed version of what the Defendant had told Det. Braden during their recorded interview. The Defendant said that he had killed the victim after she started "using psychology and reverse psychology and strategy on" him and that he knew "the TBI was putting [her] up to it."

The Defendant stated that he jumped on the victim "like a horse," beat her, and "rode her to the floor." After he finished beating her he started stabbing her. The Defendant said that he "cut her several times, probably [1,000] times." The Defendant said that the victim "was smiling" while he stabbed her and that "[a]fter about 100 stabs she said, 'I didn't know you was this good.'" The Defendant stated that over ninety percent of his body was covered in blood when he finished. The Defendant said that he "sat down and cried about what [he] had done" and that then he started to clean up and move the body. Unlike his earlier

-17-

statement, the Defendant said that the victim's body was still in the house when the LPD officer came to his door.

The Defendant said that he left some blood in the kitchen because he "wanted to see the expression on [Ms. Gooch's] face when she [saw] it." The Defendant stated that after he finished cleaning, he ate dinner and "sat in the recliner and watched TV for a while" before going to bed. The Defendant said that when the victim's family was at his house the next afternoon, he "just smiled" when Ms. Gooch said the victim was in the shed. The Defendant stated that he then told Ms. Gooch to call the police. The Defendant concluded his written statement by stating, "I did what I did to get y'all's attention. I'm going to miss her." Det. Braden testified that the Defendant did not have any apparent injuries from the attack.

## II. Evidence Regarding the Defendant's Mental State

### A. Evidence from the Defendant's Family

Candi Johns testified that she was the Defendant's daughter and that Ms. McFarland was her mother. Ms. Johns testified that there was nothing unusual about the Defendant's behavior when she was growing up. According to Ms. Johns, the Defendant told her "a couple of years ago" that he was bipolar. Ms. Johns testified that approximately a year before the murder, the Defendant started "talking crazy," "talking really, really fast," and "just saying stuff that didn't make any sense at all." According to Ms. Johns, the Defendant was "very, very focused on" church and finding "ways to get the youth in church." Ms. Johns testified that in the spring of 2011, the Defendant was hospitalized for nine days and then spent nine days living with her and her husband.

Ms. Johns described the Defendant as being "very nervous" during that time in the spring of 2011, but that afterwards, his relationship with the victim went "back to normal" and was very good. Ms. Johns testified that the Defendant stayed "back to normal" until a few weeks before the murder. Ms. Johns said she received a letter from the Defendant accusing her of threatening to kill him the previous Christmas. The letter claimed that she was upset because the Defendant had "tried to keep [her] from being in law enforcement." Ms. Johns testified that the Defendant started "talking crazy" again and stopped taking his medication. The Defendant said he wanted to start a comedy club in his garage. Ms. Johns admitted that the Defendant had been steadily employed her entire life and had served as the executor of her grandmother's estate in early 2012. Ms. Johns also testified that the Defendant never said anything to her about the TBI.

Ms. Johns's husband, Bryan Johns, testified that in the spring of 2011, the Defendant was arrested on a domestic violence charge and released on the condition that he check himself into a hospital for mental health treatment. Mr. Johns testified that he had to force the Defendant to go to the hospital. Mr. Johns also testified that while they were in the waiting room at the hospital, the Defendant told him that he had "talked telepathically" to another person in the waiting room. Mr. Johns testified that after the Defendant's hospital stay and a few days staying at his house, the Defendant started to act more normal. However, a few weeks before the murder, the Defendant started to call Mr. Johns a lot and wanted to talk about church. Mr. Johns testified that he talked to the Defendant about the letter he had sent Ms. Johns and that the Defendant was "very adamant that those things had happened."

Chris Colvett testified that he was the Defendant's son and that Ms. McFarland was his mother. Chris testified that "in the last couple [of] years" he had noticed the Defendant acting strangely. According to Chris, the Defendant started talking about God a lot and "threatening to kick [his] butt over stuff that made sense to [the Defendant] but not [him]." Chris recalled one occasion when the Defendant "talked to [him] about God for over [forty-five] minutes," and when Chris tried to interrupt, the Defendant said he could either listen or they could "go outside to the front yard." Chris described the Defendant during this encounter as being "[r]eal loud and erratic" and constantly moving.

Chris testified that a week before the murder, the Defendant wanted him to drive around town and look at real estate. Chris testified that nothing that the Defendant "was saying was making any bit of sense at all." The Defendant also told him that Ms. Johns and Ms. McFarland were part of the TBI and that they were "out to get him." Chris also testified that he called the police on the night of the murder and told them that the Defendant had a "hit list" and that he was afraid the Defendant had killed his psychologist. Chris admitted that the Defendant had mentioned to him the possibility of getting a divorce from the victim to him a year before the murder.

James Colvett testified that he knew the Defendant had "mental issues" for "[a]s long as [he could] remember." James testified that the Defendant would talk about ghosts and said that a ghost had told him to kill some children with a knife. Ms. Coward testified that the Defendant had told her that he "used to work for the TBI." Ms. Coward also testified that she knew the Defendant had been hospitalized for "mental problems" and took medication. Ms. Gooch testified that in 2011, the victim told her that the Defendant "was having mental problems" and had been hospitalized. Ms. Gooch also testified that the Defendant told her "that his boss had a machine that controlled [his] thoughts," that the TBI had "bugged" his house, and that the victim, Ms. Johns, and Mr. Johns were involved with the TBI in a conspiracy to kill him. Ms. Gooch testified that, after his hospitalization, the Defendant stopped talking about these things and started behaving normally again.

-19-

*B. The Defendant's Expert Evidence*

Doctor Stephen A. Montgomery, an expert in forensic psychiatry, testified that he evaluated the Defendant at defense counsel's request. Dr. Montgomery testified that, in evaluating the Defendant, he reviewed the Defendant's medical and employment records; the discovery materials provided by the State, including the Defendant's statements to the police; and the Defendant's jail records from the time of his arrest to trial. Dr. Montgomery testified that he also did "some brief testing" with the Defendant and interviewed the Defendant for approximately three hours.

Dr. Montgomery testified that the Defendant suffered from "longstanding" "paranoid-type delusions." Dr. Montgomery explained that a delusion is a fixed false belief and that the Defendant's delusions centered around his belief that several people, including the victim and Ms. McFarland, "had been trained by the TBI" to use "supernatural powers" in a conspiracy to kill the Defendant. These delusions also included the Defendant's belief that the victim and Ms. McFarland "could stop his heart and kill a person just by looking at him, or they could shoot eye rays that would kill him." The Defendant also believed that "he could communicate with people by just looking at them" and that people could change the color of their eyes to reflect their mood.

Dr. Montgomery testified that the Defendant told him during their interview that the victim posed an immediate threat to his life and that he had to kill her because "she was going to kill him . . . right then and there with [her] eye rays." Dr. Montgomery admitted that the Defendant had not made any claims about the victim's using "eye rays" on him in his statements to the police. Nonetheless, Dr. Montgomery testified that what was "most striking" to him about the Defendant's recorded interview with Det. Braden was that the Defendant "was very emotional, very excited, and very delusional." Dr. Montgomery further testified that the Defendant's focus on religion and sex immediately before and after the murder was consistent with someone "in a manic state."

Dr. Montgomery testified that the Defendant's delusions continued to persist despite the passage of time and treatment with medication while he was incarcerated. Dr. Montgomery found that the Defendant "really didn't have insight into" his illness. Dr. Montgomery testified that the Defendant "was cooperative" during his interview "but kind of just had a blank stare and really didn't show a whole lot of emotion . . . just kind of flat." Dr. Montgomery testified that the Defendant also made sense except when discussing his delusions.

Dr. Montgomery testified that there was "no question [the Defendant had] a severe mental disorder and [that it was] a psychotic disorder." Dr. Montgomery noted that the

Defendant had been diagnosed with "bipolar disorder, with a history of psychosis" in 2007. Dr. Montgomery testified that he originally diagnosed the Defendant as suffering from bipolar disorder. However, the persistent nature of the Defendant's delusions, even when treated with medication, and his consistent "flat expressionless behavior" suggested to Dr. Montgomery that the Defendant "may fit somewhere in between schizophrenia and bipolar disorder." Dr. Montgomery subsequently diagnosed the Defendant as having schizoaffective disorder. Dr. Montgomery explained that this meant the Defendant suffered from a combination of symptoms from schizophrenia and bipolar disorder.

Dr. Montgomery opined that, at the time of the murder, the Defendant was not able to appreciate the nature of his acts. Dr. Montgomery testified that he believed the Defendant was "acutely psychotic" when he murdered the victim, that his delusions "were very intense," and that the Defendant "felt that he was under duress or a threat of being killed as a result of what he believed were the powers that the victim had that she could kill . . . him with her eyes, with rays." Dr. Montgomery concluded that the Defendant could not "appreciate that he was killing a regular human being." Instead, the Defendant, in Dr. Montgomery's opinion, believed "that he was defending himself against this person who had these supernatural abilities that could kill him in an instant." However, Dr. Montgomery admitted that the Defendant, during their interview, stated that he knew "he was killing somebody" when he stabbed the victim.

Dr. Montgomery also opined that, at the time of the murder, the Defendant could not appreciate the wrongfulness of his actions. Dr. Montgomery explained as follows:

> . . . [A]t that moment . . . in [the Defendant's] mind he [was] being attacked by someone he's felt persecuted by, trained by law enforcement, has these other worldly supernatural abilities to kill him, that he [was] striking back to defend himself and that, in his mind, if someone is about to kill you, that that would not be wrong because you are just protecting yourself from being killed.

Dr. Montgomery further explained that he did not believe the Defendant's attempt to clean the crime scene and hide the victim's body demonstrated that the Defendant appreciated the wrongfulness of his actions. Rather, Dr. Montgomery opined that the Defendant was not thinking "logically" but "realize[d] on some level that, yeah, a lot of people [were] not going to believe [him]." However, Dr. Montgomery admitted that the Defendant, during their interview, had stated that he "knew it was wrong to kill."

Dr. Montgomery further opined that the Defendant was unable to form the requisite intent and premeditation needed to commit premeditated first degree murder. In an attempt to give context to his opinion, Dr. Montgomery explained that "most all mental disorders [are

thought of] as having some [connection to] problems with the functioning of the brain." However, Dr. Montgomery admitted that the technology did not exist to "take an individual person and do a brain scan and then [] make a diagnosis." Dr. Montgomery concluded that the Defendant was unable to form the requisite mental state because "it was his very brain that [was] not working properly."

Dr. Montgomery testified that he did not believe the Defendant was malingering, exaggerating his symptoms to avoid punishment, because the Defendant performed well on a test designed to detect malingering. Dr. Montgomery also asked the Defendant about "other symptoms," and the Defendant only answered "yes" to symptoms consistent with Dr. Montgomery's diagnosis. As an example, Dr. Montgomery testified that the Defendant said he believed that the victim was "worshiping the devil." When Dr. Montgomery asked if the Defendant heard the voice of God telling him to kill the victim, the Defendant said he did not. Dr. Montgomery noted that the Defendant did poorly on some "tests of the memory and concentration" and that he was "not really sure why" because the Defendant showed no other signs of dementia.

## C. The State's Rebuttal Evidence

Mary Beth Wortham testified that she was a human resources representative at the factory where the Defendant worked prior to the victim's murder. Ms. Wortham testified that the Defendant worked there for approximately twenty years as a production technician. Ms. Wortham testified that on April 5, 2012, she had a meeting with the Defendant because he had made "some disruptive comments on the [factory] floor." The Defendant told Ms. Wortham that "his wife wouldn't leave him alone; she always wanted to talk to him and always wanted to kiss him. And he just wanted to go to work and go home and relax." The Defendant apologized, said "it wouldn't happen again," and that he had taken care of the problem the night before "for about an hour and a half using psychology." Ms. Wortham testified that the Defendant behaved normally during the meeting, that she sent the Defendant back to work after the meeting was over, and that she would not if she had felt he was a threat to himself or to his coworkers.

Eric S. Engum, Ph.D., a clincal psychologist and expert in forensic psychology, testified that he examined the Defendant at the State's request. Dr. Engum testified that, in evaluating the Defendant, he reviewed the Defendant's medical and psychiatric records; the police investigation file; the Defendant's statements to the police; the Defendant's employment records; and the Defendant's jail records as well as recordings of the Defendant's telephone calls made from jail. Dr. Engum also met with the Defendant for sixteen hours to conduct an interview and psychological testing.

Dr. Engum began his testimony by giving the jury an overview of the Defendant's "psychiatric history." Dr. Engum noted that the Defendant's medical records went back to 2007 and that the "primary diagnosis for the first few years" was bipolar disorder and "routinely defined as mild." In the spring of 2011, the Defendant was admitted to the hospital, and his diagnosis changed to bipolar disorder, "severe with psychotic features." However, the treating psychiatrist said "in her discharge . . . that there was concern that the real diagnosis was schizophrenia instead of a bipolar disorder." Once the Defendant had been discharged from the hospital, his primary care physician again diagnosed him with bipolar disorder but "started considering an alternate diagnosis of schizophrenia." Dr. Engum testified that the Defendant's last diagnosis before the murder was of bipolar disorder, "mild." All but one of the bipolar diagnoses listed the "most recent episode" as being "depressed."

Dr. Engum agreed with Dr. Montgomery's opinion that the Defendant suffered from "a severe mental disease or defect." Dr. Engum diagnosed the Defendant as suffering from schizophrenia, noting that the Defendant's statements to the police showed "undeniable" "signs of delusions, misperceptions of reality." However, Dr. Engum opined that the severity of the Defendant's condition at the time of the offense was "mild" and that the Defendant "firmly [had] one foot in reality." Dr. Engum testified that while the Defendant was delusional, he was not "so overwhelmed by his mental illness that he [was] not aware of, in touch with, his environment." Dr. Engum opined that the Defendant, at the time of the murder, was able to appreciate the nature of his acts and the wrongfulness of his conduct.

Dr. Engum testified that the Defendant was able to maintain stable, long-term employment throughout his life. Dr. Engum testified that this showed that the Defendant had suffered no major manic or depressed phases that caused him to become "dysfunctional." Dr. Engum noted that the week before the murder the Defendant had said "some things that were disturbing, troubling to his fellow co-workers." The Defendant talked about the TBI being "after him" and that the victim "was driving him crazy and using reverse psychology on him." Dr. Engum noted that while the Defendant's statements evidenced his delusions, when the Defendant met with Ms. Wortham "he appeared to have some awareness that he was being disruptive, [and] was able to understand what he was doing and appeared stable to them and they returned him to the work place."

Dr. Engum testified that, after the murder, the Defendant went to see his cousin James and was "speaking rapidly" with "disjointed thoughts[,] . . . jumping from one topic to the next" and appeared "anxious." Again this reflected the Defendant's mental disease, but Dr. Engum noted that the Defendant asked James to help him dispose of the body without telling him who it was he had killed. Dr. Engum further noted that the Defendant also did not tell James that he had acted in self-defense. Dr. Engum testified that this caused him to question

whether the Defendant "was really operating within the context of [a] delusional state." Additionally, Dr. Engum testified that the Defendant's statement that he made sure no one was watching when he moved the body was an "indication that he knew what he was doing was wrong."

Dr. Engum likewise noted that the Defendant said nothing to Cpl. Sanders about his delusions when Cpl. Sanders performed a welfare check at the Defendant's house. Dr. Engum took special note of this because the LPD "were not included in [the Defendant's] delusional mindset." Put another way, the Defendant did not believe that the LPD were part of the conspiracy to kill him. Dr. Engum concluded from this that the Defendant was "not operating within a delusional [mind]set that [was] so overwhelming [to] his judgment, his awareness, that he [was] incapable of knowing right from wrong." Rather, this suggested to Dr. Engum that the Defendant was attempting to conceal his crime because he understood the wrongfulness of his actions.

Dr. Engum noted that early Sunday morning, the Defendant was able to drive to Walmart to buy cleaning supplies and stood "very calmly at the checkout." Dr. Engum also noted that later that day, the Defendant "played games" with the victim's family by pretending not to know what had happened to the victim and "misleading those around him." Dr. Engum testified that during the Defendant's interactions with the police that day, "there [was] evidence of a severe delusional disorder." Dr. Engum pointed out, however, that while the Defendant was in the back of Cpl. Teal's patrol car, he was "sitting up, responsive, attentive, looking, [and] inspecting." Dr. Engum further noted that the Defendant "was responsive" to Det. Braden's interview questions and gave "reasonably appropriate answer[s]." This led Dr. Engum to conclude that "the symptoms [of the Defendant's mental disease at the time] were at best mild" and that "he was not so disturbed that he was unable to appreciate the wrongful[ness of his] actions."

Dr. Engum testified that during his interview with the Defendant, he asked the Defendant on three separate occasions if the Defendant knew, at the time of the murder, that killing the victim was wrong. Dr. Engum testified that the Defendant answered "yes" every time and that his answer was the same when asked by Dr. Montgomery. Dr. Engum testified that he gave the Defendant several psychological and cognitive tests. According to Dr. Engum, the results were consistent with the Defendant's schizophrenia being "in that mild level" that had been previously reported in the Defendant's medical records. Dr. Engum further testified that his testing showed the Defendant's manic "scale" was "not elevated." Dr. Engum added that the Defendant's jail records showed that the Defendant was "presenting no behavioral problems [and] no sign of psychosis" during his incarceration. Dr. Engum testified that he believed that the Defendant had malingered on the cognitive testing

because the results showed him "in the mildly retarded range" when there was no other evidence to suggest those results.

Dr. Engum disagreed with Dr. Montgomery's characterization of the Defendant's behavior around the time of the murder as a manic episode. Dr. Engum explained that manic meant "this hyperactive, excited, agitated, disorganized, mind racing a thousand miles an hour, [an] individual who is just scattered all over the place." Dr. Engum testified that people "who are acutely and severely manic . . . will go for days without sleep." Dr. Engum testified that the fact the Defendant slept so much that Sunday "totally contradicts" the notion he was in a manic state. Dr. Engum further testified that manic phases do not turn "on and off like a light switch" and that the Defendant would have been symptomatic "for days if not weeks" if he had been in a manic state. Dr. Engum "disagreed very strongly" with Dr. Montgomery's assertions that the Defendant could have been in a manic state "in his mind" without any outward signs.

## III. Verdict

Based upon the foregoing, the jury rejected the Defendant's defense of insanity and convicted him of premeditated first degree murder. The trial court sentenced the Defendant to life imprisonment with the possibility of parole. The Defendant filed a timely motion for new trial, which the trial court denied. This appeal followed.

## ANALYSIS

### I. Insanity Defense

The Defendant contends that the jury erred by rejecting his defense of insanity. The Defendant's argument is, essentially, that the State failed to rebut Dr. Montgomery's testimony that the Defendant did not appreciate the nature and the wrongfulness of his conduct at the time of the murder. The Defendant argues that Dr. Engum was not qualified to give an opinion as to those issues.[4] The Defendant further argues that only medical doctors can opine as to whether a person can appreciate the nature and wrongfulness of his conduct because "brain functions [] can actually be seen and quantified by medical doctors." The State responds that Dr. Engum was a qualified expert in forensic psychology and that

---

[4]To support his argument, the Defendant asserts that Dr. Engum testified that he did not know if the Defendant was delusional at the time of the murder. However, the testimony the Defendant cites to is from a different witness given at a preliminary hearing. Dr. Engum testified at length about the Defendant's mental disease and the evidence of the Defendant's delusions around the time of the murder.

his opinions, along with other evidence given at trial, were sufficient to rebut the Defendant's insanity defense.

Tennessee Code Annotated section 39-11-501 provides as follows:

(a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b) As used in this section, mental disease or defect does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in section (a). Such ultimate issue is a matter for the trier of fact alone.

On appeal, this court will "reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence."[5] State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002). As such, "[w]here the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." Id. at 556. This standard is similar "to the familiar sufficiency standard which appellate courts" apply when reviewing the sufficiency of the convicting evidence. Id. at 554.

While the State "is required to prove all essential elements of a crime beyond a reasonable doubt, sanity is not an element of a crime." State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). Section 39-11-501 "places the burden of establishing this affirmative defense squarely on the defendant." Flake, 88 S.W.3d at 554. To that end, our supreme court has "explicitly reject[ed] the notion that the State must rebut defense proof of insanity with substantial evidence." Id. The State may counter the defendant's proof "by

_____

[5]Clear and convincing evidence is evidence "in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992).

contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense expert[].” Id.

"In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony.” Flake, 88 S.W.3d at 556. The jury is to determine the weight and value to be given to expert testimony regarding the defendant’s claim of insanity. Id. at 554. "Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case.” Id. The jury "may not arbitrarily ignore [expert] evidence,” but it is "not bound to accept the testimony of experts where the evidence is contested.” Id. at 556.

For example, in State v. Holder, this court upheld a trial court’s rejection of the insanity defense despite the fact that both of the experts who testified at trial opined that the defendant was unable to appreciate the wrongfulness of his conduct. 15 S.W.3d at 902, 912. Instead, the trial court "relied primarily, upon the actions and words of the defendant before, at and after the commission of the offense.” Id. at 912. The trial court "relied heavily on [the] defendant’s statement” to the police in which he "acknowledged that he knew killing ‘was wrong.’” Id. at 910. The trial court also relied upon the defendant’s later attempts to provide "some justification” or excuse for his having killed the victim. Id. Additionally, the trial court relied on the defendant’s refusal to drive on a suspended license "as indicative of his appreciation for the difference between lawful and unlawful.” Id.

Similarly, in State v. Flake, our supreme court upheld a jury’s rejection of the insanity defense despite the fact that four expert witnesses testified at the trial that the defendant was unable to appreciate the wrongfulness of his conduct. 88 S.W.3d at 544-48, 556-57. Another expert opined that the defendant was able to appreciate the wrongfulness of his conduct but felt morally justified in his actions. Id. at 547. However, our supreme court noted that "the facts surrounding the offense suggest[ed] the defendant realized his conduct was wrongful.” Id. at 556. These facts included that the defendant shot only the victim, fled after the shooting, "appeared to realize he had committed a crime,” and exhibited "no bizarre behavior.” Id.

Here, there is no doubt that the Defendant suffered from a severe mental disease. However, Dr. Montgomery and Dr. Engum were in conflict as to whether the Defendant could appreciate the nature and wrongfulness of his conduct. Dr. Engum pointed to several facts regarding the Defendant’s actions before and after the murder to support his opinion that the Defendant did appreciate the nature and wrongfulness of his conduct. Dr. Engum noted that the Defendant’s illness had been consistently classified as "mild” both before and

after the murder, and that the Defendant was able to hold long-term, steady employment throughout his life suggesting that the Defendant had suffered no major manic or depressive phases. Additionally, when the Defendant met with Ms. Wortham "he appeared to have some awareness that he was being disruptive, [and] was able to understand what he was doing."

Dr. Engum also focused on the fact that the Defendant attempted to conceal the victim's body and clean up the crime scene as evidence that he understood what he had done was wrong. Specifically, Dr. Engum noted that the Defendant concealed the identity of his victim when he asked his cousin James to help him dispose of the body and said nothing to Cpl. Sanders during the welfare check the night of the murder about the victim's alleged attack on him. Dr. Engum found the Defendant's actions towards Cpl. Sanders particularly persuasive because the Defendant repeatedly asserted that the LPD was not a part of the conspiracy to kill him and that he was planning to report the victim's death to the LPD. Dr. Engum also noted that, the next day, the Defendant "played games" with Ms. Coward, Ms. Gooch, and Cpls. Teal and Christmas by telling them that the victim was alive that morning and that he did not know where she was.

The Defendant repeatedly stated during his interview with Det. Braden that he regretted killing the victim and was upset about her death. More importantly, the Defendant told both Dr. Montgomery and Dr. Engum that he understood that he had killed the victim and that doing so was wrong. Dr. Engum disagreed with Dr. Montgomery's assessment that the Defendant was in a manic state during the murder, noting that video from both early Sunday morning and Sunday afternoon showed the Defendant behaving "very calmly." Likewise, Dr. Engum found that the Defendant's excessive sleeping on Sunday was in direct conflict with the Defendant's being in a manic state. Accordingly, we conclude that Dr. Engum's testimony, along with the evidence regarding the Defendant's behavior before and after the murder, was sufficient to rebut Dr. Montgomery's opinion that the Defendant did not understand the nature and wrongfulness of his conduct.

The Defendant's argument that only medical doctors can opine as to whether a person can appreciate the nature and wrongfulness of his conduct and that Dr. Engum was not qualified to give an opinion on those issues misinterprets Dr. Montgomery's testimony at trial. Dr. Montgomery did not testify, as the Defendant argues, that "brain functions [] can actually be seen and quantified by medical doctors." Rather, Dr. Montgomery testified that there was a general consensus that "most all mental disorders [are thought of] as having some [connection to] problems with the functioning of the brain" but that the technology did not exist to "take an individual person and do a brain scan and then [] make a diagnosis." As such, there was no testimony that any tests were performed on the Defendant's brain or that any of his "brain functions" had been "seen and quantified" by Dr. Montgomery.

Both Dr. Montgomery and Dr. Engum were well-qualified experts in their respective fields of forensic psychiatry and forensic psychology, and both were qualified to give their opinions as to whether the Defendant could appreciate the nature and wrongfulness of his conduct. There being a conflict in the evidence between Dr. Montgomery and Dr. Engum's expert opinions, we will not disturb the jury's verdict. Accordingly, we conclude that the record supports the jury's rejection of the Defendant's insanity defense.

## II. Witnesses' Prior Statements

The Defendant contends that the trial court erred by not allowing defense counsel to take home, during the trial, written statements made by Ms. Gooch and by not admitting extrinsic evidence of prior written statements made by Mr. Coward and Ms. Gooch. The Defendant argues that the trial court's refusal to allow defense counsel to take home Ms. Gooch's statements "demonstrates the unbalanced field that existed the entire trial." The Defendant also argues that Mr. Coward and Ms. Gooch's statements were admissible because they "were written by the witnesses and identified by them" and "would have impeached and embellished their testimony." The State responds that the Defendant has waived these issues by failing to cite in his brief to any legal authority to support his argument.

At trial, the State provided to the Defendant prior written statements made by Mr. Coward and Ms. Gooch pursuant to Tennessee Rule of Criminal Procedure 26.2, commonly referred to as the Jencks rule. Both Mr. Coward and Ms. Gooch identified their statements and admitted to making them. The Defendant sought admission of the statements, which the trial court denied. Instead, the statements were marked for identification only. Ms. Gooch was called as a witness late in the afternoon, and the trial court adjourned for the day during the Defendant's cross-examination of Ms. Gooch. After the jury left the courtroom, the Defendant was allowed to extensively voir dire Ms. Gooch about her prior written statements. Then the following exchange occurred:

> [Defense counsel]: . . . I want to take [Ms. Gooch's statements] with me tonight.
>
> . . . .
>
> [Trial court]: I have already ruled on that. So you and [the prosecutor] are going to stay here until midnight for you to read any Jencks material you want to read. They won't be copied at this point in time.
>
> [Defense counsel]: I'd take it to prepare for cross-examination.

[Trial court]: I am not going to allow it.

[Defense counsel]: Thank you.

[Trial court]: You had indicated you had asked the questions you were going to ask her.

[Defense counsel]: About this.

[Trial court]: Yeah, about what you are trying to take home, yes.

[Defense counsel]: I may not be finished.

[Trial court]: You can take it back up. When you get here in the morning, we will hand it to you and you can just ask all the questions you want . . . .

The next morning, the Defendant concluded his cross-examination of Ms. Gooch and questioned her extensively about her prior statements.

We agree with the State that the Defendant has waived full appellate review of these issues. The Defendant failed to include these issues in his motion for new trial. See Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence. . . or [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial"). Additionally, the Defendant has failed to supply any citations to legal authorities to support his contentions. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Due to the Defendant's waiver of these issues, we examine the issues solely to determine whether plain error review is appropriate.

The doctrine of plain error only applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Plain error review is not appropriate regarding the trial court's refusal to allow defense counsel, during trial, to take home Ms. Gooch's statements because the Defendant has failed to establish that a substantial right of his was adversely affected. Defense counsel was given Ms. Gooch's statements pursuant to Tennessee Rule of Evidence 26.2, reviewed the statements, and was allowed to extensively voir dire her about the statements. The next morning, Ms. Gooch was extensively cross-examined about her statements. Additionally, the trial court allowed defense counsel to remain in the courtroom to review the statements for as long as he needed after it had adjourned for the day.

Plain error review is also not appropriate regarding the trial court's refusal to admit extrinsic evidence of Mr. Coward and Ms. Gooch's prior written statements because the Defendant has failed to establish that a clear and unequivocal rule of law has been breached. It is well established that while a witness may be impeached with a prior inconsistent statement, "[e]xtrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998). Here, both Mr. Coward and Ms. Gooch unequivocally admitted to making their statements. Accordingly, we conclude that plain error review is not warranted and that these issues are without merit.

### III. Brady Violation

The Defendant contends that the State failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83 (1963). The Defendant argues that the State "hid" a human resources report and statements from several of the Defendant's co-workers regarding "work incidents" that demonstrated the Defendant's "severe mental problems" two days before the murder. The State responds that the evidence in question was not Brady material and that the Defendant was not prejudiced by its failure to disclose the evidence prior to trial.

At the close of the State's proof, the Defendant moved for a mistrial arguing that the reports of the State's expert witnesses, Dr. Engum and Bruce Seidner, Ph.D.,[6] both

---

[6]Dr. Seidner examined the Defendant for the limited purpose of determining his competency to stand trial and to waive his rights when interviewed by Det. Braden. Dr. Seidner testified in a pretrial hearing but did not testify at trial.

referenced a human resources report from the Defendant's employer regarding an "incident," but that the State had failed to disclose this report to the Defendant. The State responded that "several employees" from the Defendant's employer were included on a witness list provided a year before trial and that Ms. Wortham's name was disclosed on a supplemental discovery response. The State further responded that Dr. Engum's report was provided to the Defendant six months before trial and that it referred to the human resources report and the workplace incidents. Additionally, the State noted that Dr. Seidner's report was provided to the Defendant several weeks before trial and contained the same references as Dr. Engum's report.

The trial court ordered the State to provide the human resources report, which had attached to it statements from several of the Defendant's co-workers, to the Defendant. Defense counsel and Dr. Montgomery then reviewed the report and the statements. After they finished reviewing the report, the State noted that all of the employees at issue were under subpoena. The trial court allowed defense counsel to meet with and interview those employees that night to decide if he wanted to call them as witnesses. Dr. Montgomery testified the next day that he had used the report and statements in forming his expert opinion. The Defendant did not call as witnesses any of the employees named in the report or the statements. Ms. Wortham testified during rebuttal for the State and was cross-examined regarding the Defendant's statements contained in the report and other employees' statements.

In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). However, the State is not required to disclose "information that the accused already possesses or is able to obtain, or information which is not possessed by or under the control of the prosecution or another governmental agency." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (internal citations omitted). "When exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'" Id. (quoting United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985)) (brackets in original).

This court has recently noted as follows:

Brady obviously does not apply to information that is not wholly within the control of the prosecution. There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available

-32-

> . . . from another source, because in such cases there is really nothing for the
> government to disclose.

Berry v. State, 366 S.W.3d 160, 179-80 (Tenn. Crim. App. 2011) (quoting Owens v. Guida,
549 F.3d 399, 415 (6th Cir. 2008)) (ellipsis in original).

Here, the report and statements at issue were created by the Defendant's employer and
not the State or an entity of the State.[7]  As such, the evidence was obtainable from another
source.  Furthermore, the State included the names of several of the Defendant's co-workers
in a witness list provided to the Defendant a year before trial, and the report and incident
were referenced in both Dr. Engum and Dr. Seidner's expert reports.  Defense counsel was
able to review the report and employees' statements, interview the employees, and was given
the option to call them as witnesses.  Dr. Montgomery reviewed the report and statements
and testified that he used the evidence in forming his expert opinion.  Lastly, Ms. Wortham
was cross-examined by the Defendant about the incident and the employees' statements.
Accordingly, we concluded that there was no Brady violation and that this issue is without
merit.

### IV. Request for Transcripts

The Defendant contends that the trial court erred by refusing to provide him with a
transcript of a prior hearing in this case.  The Defendant argues that, due to his indigence, he
was entitled to "a partial transcript of a previous hearing wherein experts for both the State
and Defendant testified about his mental condition."  The Defendant further argues that he
needed the transcript "to prepare for upcoming expert testimony" and to prepare for cross-
examination of the State's expert, Dr. Engum.  The State responds that the Defendant has
"not state[d] a proper basis for relief."

A year before trial, the Defendant filed a motion to be declared indigent along with
affidavits to support the motion, in order to pay for Dr. Montgomery's services as an expert
witness.  The State opposed the motion and requested a hearing on the Defendant's
indigence, suggesting that the Defendant had access to greater assets than alleged in the
affidavits.  The Defendant then withdrew his motion and agreed to pay Dr. Montgomery's
fee "privately."  During a break in the trial, defense counsel stated that he had "asked the
wonderful court reporter to do some work over the weekend" and that she had asked if he

---

[7]In a "supplemental reply" brief, the Defendant cites State v. Noura Jackson, -- S.W.3d -- , No. W2009-
01709-SC-R11, 2014 WL 4161966, at *30-34 (Tenn. Aug. 22, 2014), to support his argument that the State's
failure to disclose the evidence was a Brady violation.  However, this case is distinguishable from Jackson
because the statement at issue there was given by a witness to the police.

"was going to pay her for that." Defense counsel stated that it was his view "that the [D]efendant is indigent[;] . . . therefore, he is entitled to that transcript." Defense counsel added that he was "making that request before the [c]ourt. [The Defendant] doesn't have any money with which to pay" for the transcript.

The trial court responded to defense counsel's request saying that it would not order the court reporter "to work for nothing on that over the weekend. If you want something expedited, you will have to pay for it. Then we can fuss over who ultimately is going to pay for it." Later, defense counsel objected that the State was using a transcript of Dr. Montgomery's testimony from a pretrial hearing during its cross-examination of Dr. Montgomery when the Defendant was "denied" a transcript of the hearing. Defense counsel stated that he "wanted the transcript of Dr. Seidner['s testimony]" and was "denied." The trial court pointed out that "no one has kept you from purchasing one" and that defense counsel raised the issue "in the middle of a trial" when he had "ample opportunity to ask for that before" the trial. The trial court also pointed out that Dr. Seidner had not testified at trial.

Defense counsel argued with the trial court that "it is not incumbent upon defense counsel to pay for expenses of litigation when the defendant is indigent." The trial court asked if there was "an adjudication that [the Defendant] was indigent? He has hired counsel." Defense counsel responded that "there are affidavits in the record of his indigency." The State responded that a request was made before "the prior judge" and that the Defendant had withdrawn the request. The trial court responded, "That was before I was in it, so I don't think I have been asked to resolve that. I don't feel I am being asked to provide any relief today, so let's get the jury back in." The Defendant did not raise the issue again.

In Tennessee, "an indigent defendant in a criminal prosecution must be provided with the tools of an adequate defense or appeal when those tools are available for a price to other defendants." State v. Elliot, 524 S.W.2d 473, 475 (Tenn. 1975). Generally included in these basic tools is "a free transcript of prior proceedings in the indigent defendant's own case, where the transcript [is] needed to vindicate a legal right." Id. at 476; see also Tenn. Code Ann. §§ 40-14-309, -312. However, the decision to provide a transcript is within the discretion of the trial court and "there is no positive duty to furnish transcripts of prior proceedings." Bowers v. State, 512 S.W.2d 592, 594 (Tenn. Crim. App. 1974). In determining need, courts should look to "(1) the value of the transcript to the defendant in connection with the . . . trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." Elliot, 524 S.W.2d at 476 (quoting Britt v. North Carolina, 404 U.S. 226, 227 (1971)).

This court has previously acknowledged that a defendant who is not indigent at the outset of trial may later find himself indigent, for example on appeal. See State v. Draper, 800 S.W.2d 489 (Tenn. Crim. App. 1990). In such cases, the defendant may "file a motion with the clerk of the trial court seeking the entry of an order declaring him indigent, appointing counsel to represent him, and providing for the transcription of the evidence and proceedings relevant to the issues which will be presented to the appellate court for review." Id. at 495. Here, the Defendant was not indigent at the start of the proceedings, but he filed a motion to be declared indigent a year before trial. The Defendant withdrew the motion when it was challenged by the State. When the Defendant requested a transcript of Dr. Seidner's pretrial testimony, he did not file a new motion to be declared indigent with updated financial information, choosing instead to rely on the challenged, year-old affidavits which the trial court had not reviewed. As such, the Defendant was not indigent and not entitled to the transcript of Dr. Seidner's testimony for free.

Furthermore, even if the Defendant had been indigent at the time of his request, he has failed to show that the trial court abused its discretion in denying the request. The Defendant "has the burden in this [c]ourt of showing that the transcript was needed to vindicate a legal right." State v. West, 767 S.W.2d 387, 402 (Tenn. 1989). Dr. Seidner did not testify at trial, and the Defendant has failed to demonstrate how he would have used the transcript at trial, beyond his conclusory statements that he needed it "to prepare for upcoming expert testimony" and to prepare for cross-examination of the State's expert, Dr. Engum. Further, the Defendant has made no attempt "to articulate how he could have used" Dr. Seidner's pretrial testimony "for impeachment purposes at trial if the transcript had been available." Id. Accordingly, we conclude that this issue is devoid of merit.

*V. Prosecutorial Misconduct During Cross-Examination*

The Defendant contends that the State committed prosecutorial misconduct during the cross-examination of Dr. Montgomery. The Defendant alleges that Dr. Montgomery "choked-up, broke down, hid his face, could not speak, and began to cry uncontrollably" when the prosecutor "pressed him about his father's last days and death from cancer." The Defendant argues that there "was no purpose for this improper and insensitive questioning" and that "it was highly prejudicial" to him. The State responds that the Defendant has waived this issue by failing to cite in his brief any legal authority to support his argument. The Defendant replies that the "issue was sufficiently briefed and argued" in his original brief.

During the cross-examination of Dr. Montgomery, the following exchange occurred:

[Prosecutor]: You have told the ladies and gentlemen of the jury that you teach at Vanderbilt.

[Dr. Montgomery]: Yes

[Prosecutor]: Is that correct?

[Dr. Montgomery]: Correct.

[Prosecutor]: When you left the two hospitals - - I guess Washington state, Tacoma, Washington - - is that right?

[Dr. Montgomery]: Correct.

[Prosecutor]: - - is the last hospital you left. You went from there to where?

[Dr. Montgomery]: Well, I came back home to Clarksville to take care of my father, who was dying with cancer.

[Prosecutor]: I'm sorry. But you came back home. You handled that situation appropriately, I am sure. And I apologize for bringing that up to you. But I am talking about where did you go to work next?

[Dr. Montgomery]: (no audio response.)

[Prosecutor]: I know exactly how you feel. I just recently lost my mother, so I know what you are saying.

[Trial court]: Would you like a break?

[Dr. Montgomery]: (Indicates in the affirmative.)

[Trial court]: Why don't you just step directly back there. There is a way out into the hall.

(Dr. Montgomery stepped out of the courtroom. [Defense counsel] went to check on him.)

(Respite.)

-36-

(Witness resumed the stand.)

[Trial court]: All right, General.

[Prosecutor]: Thank you, Judge. What I was getting to, Doctor, is that your next employment after Tacoma, Washington, was where?

[Dr. Montgomery]: At Vanderbilt University.

We agree with the State that the Defendant has waived full appellate review of this issue. The Defendant failed to raise a contemporaneous objection during the State's cross-examination of Dr. Montgomery. See Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Likewise, the Defendant failed to include this issue in his motion for new trial. See Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated [on] . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial"). Additionally, the Defendant has failed to supply any citations to legal authorities to support his argument. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Due to the Defendant's waiver of this issue, we examine the issue solely to determine whether plain error review is appropriate.

Plain error review of this issue is not appropriate here because the Defendant has failed to establish that "a clear and unequivocal rule of law" has been breached. Page, 184 S.W.3d at 230. "The interrogation of all witnesses should be conducted fairly, objectively, and with due regard for the dignity and legitimate privacy of the witness, and without seeking to intimidate or humiliate the witness unnecessarily." ABA Standards for Criminal Justice, Prosecution Function std. 3-5.7(a) (3d ed. 1993). The record belies the Defendant's assertion that the prosecutor "pressed [Dr. Montgomery] about his father's last days and death from cancer." Rather, the prosecutor simply asked Dr. Montgomery where he went after he left his job in Tacoma, Washington, and Dr. Montgomery responded that he moved back to Tennessee to take care of his father and was overcome with emotion. There is simply nothing in the record to suggest that the prosecutor's actions were intended to harass, intimidate, or degrade Dr. Montgomery. See State v. Salamon, 949 A.2d 1092, 1131 (Conn. 2008) (finding prosecutorial misconduct where "gratuitous use of sarcasm" was used by the prosecutor to "mock and belittle" a witness); State v. Adams, 439 S.E.2d 760, 766-67 (N.C. 1994) (finding prosecutorial misconduct where the prosecutor repeatedly tapped a stick on

the side of the witness stand "for the purpose of irritating or provoking a witness"). Accordingly, we conclude that this issue lacks any merit.

*VI. Waiver of Right to Testify*

The Defendant contends that the trial court erred by questioning him about his decision not to testify at trial. The Defendant argues that this questioning, out of the presence of the jury, "required him to 'testify'" against his will. The State responds that the Defendant has waived this issue by failing to cite in his brief any legal authority to support his argument. The Defendant replies that the "issue was sufficiently briefed and argued" in his original brief.

Throughout the trial, defense counsel asserted that the Defendant was not competent "to assist counsel in any regard with regard to defending himself" despite the fact that Dr. Montgomery and Dr. Seidner both found the Defendant competent to stand trial. As a result, the trial court had a lengthy discussion with the prosecutors and defense counsel about questioning the Defendant regarding his decision whether to testify at trial. At the close of the Defendant's proof, the trial court questioned the Defendant about his right to testify, if he had consulted his attorney about the decision, and whether he wanted to testify at trial. The Defendant responded that he did not and that it was a "free and voluntary decision." At no point did the Defendant object to this procedure.

We agree with the State that the Defendant has waived full appellate review of this issue. The Defendant failed to raise a contemporaneous objection during the trial court's questioning. See Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Likewise, the Defendant failed to include this issue in his motion for new trial. See Tenn. R. App. P. 3(e) (stating that "no issue presented for review shall be predicated [on] . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial"). Additionally, the Defendant has failed to supply any citations to legal authorities to support his argument. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Due to the Defendant's waiver of this issue, we examine the issue solely to determine whether plain error review is appropriate.

Plain error review of this issue is not appropriate here because the Defendant has failed to establish that "a clear and unequivocal rule of law" has been breached. Page, 184 S.W.3d at 230. Typically, defense counsel should question the defendant in a jury out hearing "to establish on the record that the defendant has personally made a knowing,

intelligent, and voluntary waiver" of the right to testify and "the trial judge should play no role in this procedure." State v. Rimmer, 250 S.W.3d 12, 27-28 (Tenn. 2008) (citing Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999)). However, "when defense counsel fails to adequately obtain a waiver [] the trial judge should intervene." Id. at 28 n.4 (citing Momon, 18 S.W.3d at 162). Here, defense counsel repeatedly stated his concerns that the Defendant could not participate in his defense and made no request for a Momon hearing. As such, the trial court's questioning of the Defendant was not error. Furthermore, the Defendant has failed to establish that a substantial right of his was adversely affected. Page, 184 S.W.3d at 230. The Defendant argues that the trial court's questioning "required him to 'testify'"; however, the Defendant ultimately did not testify at trial. Accordingly, we conclude that this issue is without merit.

*VII. Prosecutorial Misconduct During Closing Argument*

The Defendant contends that the State committed prosecutorial misconduct during its closing argument by commenting on his decision not to testify. The Defendant argues that the prosecutor's statement, "I don't know because we don't have any proof; nobody to talk to" was an improper comment on his decision not to testify. The Defendant asserts that the prosecutor "walked deliberately to the defense table, very close to [the Defendant] and directly in front of him and stared directly at him" when making the statement. The State responds that the prosecutor's comment did not refer to the Defendant's silence, "but to the lack of evidence" instead.

During his closing argument, the prosecutor was discussing Cpl. Sanders's welfare check at the Defendant's home on the night of the murder. The prosecutor stated as follows:

> [Cpl. Sanders] remembered that [the Defendant] had a set of keys in his hand.
>
> Now, I don't know because we don't have any proof; nobody to talk to; I don't know how long because what you didn't know when [Cpl. Sanders] was standing there or sitting there in front of you is that the [D]efendant had been to Mount Pleasant, Tennessee to see his cousin James Colvett sometime between 8:00 and 8:30 p.m. We know it is a [thirty-five] to [forty-five] minute roughly minute drive at least from where he lives in Mount Pleasant to the courthouse.
>
> I don't know how long he had been back from there. I don't know what else he was getting ready to do. But we know he had keys in his hand when he was going down [to answer the door] . . . .

-39-

The prosecutor then went on to continue his discussion of Cpl. Sanders's interaction with the Defendant.

At the conclusion of the prosecutor's closing argument, the Defendant moved for a mistrial arguing that the prosecutor's statement, "I don't know because we don't have any proof; nobody to talk to" was an improper comment on his decision not to testify. The trial court reviewed the transcript of the argument and found "there [was] no reference to his failure to testify" and that it "could not find anything that was commenting on the failure of this defendant to testify" in the remainder of the State's argument. The trial court made the same findings at the motion for new trial hearing. When defense counsel raised the issue of the prosecutor's making the comment "right in front of the [D]efendant," the trial court noted that he "was right in front of the jury" and that it was a small courtroom. The trial court further noted that "[t]here were no hand gesture[s]. He wasn't pointing at the [D]efendant or anything."

At the outset, we note that the Defendant included only a small excerpt of the State's closing argument in the appellate record. The appellant bears the burden of having a transcript prepared such "as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Failure to include the necessary transcripts for our review forces this court to "conclusively presume that the ruling of the trial judge was correct." State v. Draper, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). As such, we must presume that the trial court's statements in ruling on the Defendant's motion for a mistrial and at the motion for new trial hearing were correct and that there were no other references made by the prosecutor regarding the Defendant's decision not to testify at trial.

Likewise, the Defendant has not included any affidavits or other evidence in the record to support his assertion that the prosecutor "walked deliberately to the defense table, very close to [the Defendant] and directly in front of him and stared directly at him" when making the statement at issue. "Mere statements of counsel, which are not appropriate proffers or not effectively taken as true by the parties, cannot establish what occurred in the trial court unless supported by evidence in the record." State v. Thompson, 832 S.W.2d 577, 579 (Tenn. Crim. App. 1991); see also State v. Noura Jackson, -- S.W.3d --, No. W2009-01709-SC-R11-CD, 2014 WL 4161966, at *27 (Tenn. Aug. 22, 2014) (considering "defense counsel's contemporaneous comments and subsequent affidavit describing the lead prosecutor's body language and the tone and volume of her voice when making the remark" in analyzing whether the prosecutor's remark was improper). As such, we must presume that the trial court's statements concerning the size of the courtroom and that the prosecutor made no gestures toward the Defendant when making the remark were also correct.

Both the United States and the Tennessee Constitutions "guarantee criminal defendants the right to remain silent and the right not to testify at trial." Jackson, 2014 WL 4161966, at *24. "While closing argument is a valuable privilege that should not be unduly restricted, . . . comment upon a defendant's exercise of the state and federal constitutional right not to testify should be considered off limits to any conscientious prosecutor." Id. at *28 (internal citations and quotation marks omitted). In addition to direct comments on a defendant's decision not to testify, "indirect references on the failure to testify also can violate the Fifth Amendment privilege." Id. at *25 (quoting Byrd v. Collins, 209 F.3d 486, 533 (6th Cir. 2000)) (internal quotation marks omitted).

Our supreme court recently adopted "a two-part test for ascertaining whether a prosecutor's remarks amount to an improper comment on a defendant's exercise of the constitutional right to remain silent and not testify." Jackson, 2014 WL 4161966, at *26. The test examines: "(1) whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." Id. We review claims of an impermissible prosecutorial comment on a defendant's decision not to testify de novo. Id.

This court has long cautioned that "[r]emarks which skirt the edges of impermissible comment are neither desirable nor worth the risk of reversal of what may well be a thoroughly deserved conviction." Taylor v. State, 582 S.W.2d 98, 101 (Tenn. Crim. App. 1979) (quoting State v. Dent, 241 A.2d 833, 840-41 (N.J. 1968)). Our supreme court recently overturned a second degree murder conviction where the prosecutor, during closing rebuttal argument, "walked across the court room, stood in front of [the d]efendant, gestured toward her, and demanded in a loud voice, 'Just tell us where you were! That's all we are asking, Noura!'" Jackson, 2014 WL 4161966, at *27.

Here, there is no evidence that the prosecutor's manifest intent was to comment on the Defendant's right not to testify when he stated there was "nobody to talk to." Nor were the prosecutor's statement and actions as direct or animated as those of the prosecutor in Jackson. The State argues that the prosecutor's statement was merely an assertion regarding the "lack of evidence" about the timing of the Defendant's actions after the murder. However, "a prosecutor's comments on the absence of any contradicting evidence may be viewed as an improper comment on a defendant's exercise of the right not to testify when the defendant is the only person who could offer the contradictory proof." Jackson, 2014 WL 4161966, at *25 n.45. The only other person "to talk to" about how long the Defendant had been home prior to the welfare check was the Defendant. Given the context of the prosecutor's statement, that the prosecutor did not know how long the Defendant had been back at his house or what the Defendant was planning to do when Cpl. Sanders arrived, we

-41-

conclude that it was of such a character that the jury would necessarily have taken it to be a comment on the Defendant's failure to testify despite its indirect nature.

This, however, does not end our inquiry. We must next examine whether this non-structural constitutional error was harmless. Jackson, 2014 WL 4161966, at \*28-29. In making such a harmless error analysis, our supreme court has considered such factors as (1) whether the remarks were isolated or extensive; (2) whether the remarks "came at a critically important juncture in the trial"; (3) the prosecutor's verbal and physical delivery of the remarks; (4) what curative instructions were given and when; and (5) whether the evidence of the defendant's guilt was otherwise overwhelming. Id. at \*29; see also United States v. Wells, 623 F.3d 332, 338 (6th Cir. 2010) (applying a four-factor test to claims of improper indirect comments on a defendant's silence which includes several of the factors considered by our supreme court in Jackson).

Here, the prosecutor's remark was isolated. The Defendant has not pointed to any other remarks during the State's closing argument that commented upon the Defendant's decision not to testify, and the trial court, in overruling the Defendant's motions for a mistrial and new trial, found that there were no other instances. Unlike the comment in Jackson, the comment at issue here came during the State's initial closing argument, giving the Defendant the "opportunity to respond to the argument." Jackson, 2014 WL 4161966, at \*29. Additionally, there is nothing in the record to suggest that there was anything forceful or remarkable about the prosecutor's verbal and physical delivery of the remark. The prosecutor was standing in front of the Defendant, but as the trial court noted, he was arguing to the jury and did not gesture toward the Defendant.

The Defendant did not request any curative instructions and none were given. However, the trial court did instruct the jury during its charge that the statements and arguments of counsel were not evidence and that the jury was to "place no significance on" the fact that the Defendant did not testify. Here, the instructions given during the normal course of the trial court's jury charge did not highlight the prosecutor's comment or the Defendant's decision not to testify as the curative instructions given in Jackson did. Jackson, 2014 WL 4161966, at \*29 (stating that the trial court's curative instructions "likely served to emphasize further Defendant's exercise of her constitutional right not to testify"). Finally, the evidence of the Defendant's guilt was otherwise overwhelming, unlike the "entirely circumstantial" case against the defendant in Jackson. Id. Accordingly, we conclude that the error was harmless beyond a reasonable doubt.

*VIII. Cumulative Error*

The Defendant contends that, even if no single error requires a new trial, the cumulative effect of multiple errors mandates such action. The Defendant argues that there were several errors during the course of his trial and that "when considered in combination it is clear that a new trial is mandated." The State responds that there can be no cumulative error because the Defendant "has failed to establish any error."

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare." Id. Having discerned only one error during the Defendant's trial, and it being deemed harmless, there can be no cumulative error. Accordingly, we conclude that this issue is without merit.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-43-