IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 6, 2018 Session

**STATE OF TENNESSEE v. LINDA ANNE DUNAVANT**

**Appeal from the Circuit Court for Tipton County**
**No. 8717     Joseph H. Walker III, Judge**

—————————

**No. W2018-00031-CCA-R3-CD**

—————————

The Defendant, Linda Anne Dunavant, was convicted by a jury of aggravated assault and two counts each of first degree felony murder, aggravated child neglect, and aggravated arson. She challenges her convictions on appeal, arguing that (1) the evidence was insufficient to support her convictions, specifically that the State did not negate her expert's testimony that "the fire rekindled by accident," and (2) the trial court erred in refusing to issue an instruction on setting fire to personal property or land, and its attempt, as a lesser-included offense of aggravated arson. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Bo G. Burk, District Public Defender; and David A. Stowers (on appeal and at trial) and Melissa A. Downing (at trial), Assistant District Public Defenders, for the appellant, Linda Anne Dunavant.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., and Jason R. Poyner, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

The July 2016 term of the Tipton County Grand Jury returned an indictment against the Defendant based upon the Defendant's involvement in the April 1, 2016 fire

at her Shoaf Avenue residence in Covington. The Defendant was alleged to have poured lighter fluid on the loveseat where her boyfriend was sitting and to have ignited it, which ultimately led to the residence burning down and to the death of her two infant grandchildren who were asleep inside. The Defendant was charged with two counts of first degree felony murder, two counts of aggravated arson, two counts of aggravated child neglect, and one count of aggravated assault. See Tenn. Code Ann. §§ 39-13-102, -13-202(a)(2), -14-302(a)(1) & (2), -15-402(a)(1). The Defendant proceeded to a trial by jury.

The proof at trial showed that Michael Rowand awoke during the early morning hours of April 1, 2016, around 3:00 a.m. to go to the bathroom. While up, Mr. Rowand noticed the Defendant's residence, which was "kind of catty-cornered" to his, ablaze. He called 911, and then ran across the street to the duplex to help. Mr. Rowand noticed that the Defendant's front door was standing open, and he could see that the living room was on fire. He "hollered" inside for the Defendant, but he "didn't hear anything." Because Mr. Rowand did not "see any commotion" inside the residence and got no response from the Defendant when he hollered inside, he assumed that the Defendant had "gone to the store or something." Mr. Rowand proceeded to the other side of the duplex and assisted Ms. Booker, Ms. Booker's thirteen-year-old son, and their two dogs get out of the home.

Officer James Perry with the Covington Police Department ("CPD") was the first to arrive on the scene. Upon arrival, Officer Perry "observed the residence to be fully engulfed on the front side of the building" and flames were coming out of the window on the north side. Officer Perry and Mr. Rowand responded to a woman screaming from the back of the residence and discovered the Defendant lying on the ground by the back door of her residence. Officer Perry saw that the Defendant had soot on her face and what he believed to be mucus coming out of her nose. The Defendant told Officer Perry that "she was burnt" and that there were two children still inside the residence. Mr. Rowand described that the Defendant "was hollering, telling get her grandbabies out of the house[.]" In addition, Ms. Booker testified that, as she was exiting her side of the duplex, she saw the Defendant in the grass, "crawling around from the behind the house." Ms. Booker said that the Defendant screamed Ms. Booker's name and asked for help for her grandchildren who were still inside.

When Officer Perry asked the Defendant where the children were located, the Defendant told him that they were "in the back bedroom." Officer Perry tried to break the children's bedroom window with his flashlight but was unsuccessful. Mr. Rowand then used a wheelchair on the ground nearby to break the window. When Mr. Rowand moved the curtains, black smoke came billowing out, making passage impossible.

CPD Officer John Covington was next arriving on the scene of the fire. As Officer Covington ran through the yard, Officer Perry informed him that "there might be

two children entrapped in the apartment." Officer Covington testified that they were unable to get through the front door because the front of the residence "was fully engulfed." When Officer Covington tried the back door, the fire was too hot, and he could not enter.

Firefighters arrived shortly thereafter. Officer Dee Wallace with the Covington Fire Department ("CFD") responded to the fire and saw that "[t]he north end of the structure was on fire, coming through the soffit, the end soffit of the house." "[T]here was fire coming out of the window as well, above an air conditioner unit." Officer Wallace went around to the back of residence where he encountered Officer Covington, who informed him that possibly two children were still inside but that they had been unable to gain access. Thereafter, Officer Wallace, along with CFD Officer Baker McCool, went inside the back door of the residence through the kitchen looking for the children. They moved through the kitchen and into a hallway. Ultimately, Officer McCool made his way into a bedroom and found the first victim. Eventually, Officer Wallace found the second child in the same bedroom between a mattress and the back wall, under the window. Efforts were made to resuscitate both children, to no avail. Both Officers Perry and Covington stated that they never saw any apparent signs of life in either child.

Officer Perry stated that he had to "physically take" the Defendant to the front of the residence. According to Officer Perry, the Defendant was walking and crawling half of the way. Mr. Rowand testified that the Defendant appeared "pretty distraught" while lying there in the street.

CFD Captain Glenn Travis also responded to the fire, stating the he arrived on the scene at 3:16 a.m. Captain Travis described that fire was coming out of the front door, the living room window, and the attic vent. Captain Travis observed that the Defendant "was burnt from the bra line up. Appeared to have second degree—first and second degree burns on the upper part of her body. Not much singeing of the hair that [he] could tell."

Ms. Booker testified at trial that the Defendant's grandchildren had been at the residence earlier in the day. When Mr. Rowand was asked at trial if he was aware that there was a possibility that children were inside the residence, Mr. Rowand replied that he had seen the children at the residence "either earlier that morning or the day before." He could not recall the exact timeframe, but he remembered "seeing the babies there outside in the front yard playing."

Ms. Jalessa Carruthers testified at trial that she lived directly across the street from the Defendant on April 1, 2016, and that she had known the Defendant for about six or seven months at that time. Ms. Carruthers maintained that, about 5:30 or 6:00 p.m. on

March 31, she encountered the Defendant "standing in the road asking where her dope man [was]" and asking Ms. Carruthers to take her to the liquor store. Despite the fact that the Defendant was "already wasted," Ms. Carruthers took the Defendant to the liquor store, where the Defendant purchased "a big bottle" of "brown liquor." Ms. Carruthers saw the Defendant's boyfriend, Mr. Thomas Jones, sitting on the front porch of the residence when they left to go to the liquor store. In addition, when they returned from the liquor store, Ms. Carruthers saw the Defendant and Mr. Jones sitting "outside on the porch for a little while" drinking "their liquor." Ms. Carruthers stated that she observed "random people" coming in and out of the Defendant's home that evening.

Ms. Carruthers also recalled that the Defendant's two grandchildren were there when Ms. Carruthers arrived home from work around 5:30 p.m. Ms. Carruthers explained that, at that time, she saw the Defendant holding the baby and the other child playing on the sidewalk. Furthermore, according to Ms. Carruthers, the Defendant offered to pay her for babysitting, but Ms. Carruthers declined. Finally, at the end of the evening, Ms. Carruthers observed the Defendant take the children inside, opining that the Defendant had the children at her home "all day, basically."

Ms. Carruthers was awakened by the fire in the early morning. While outside during the ensuing commotion, Ms. Carruthers saw the Defendant lying "on the concrete asking for a cigarette." The Defendant did not appear to be injured, in Ms. Carruthers's opinion.

Ms. Carruthers testified that she was recently incarcerated on an unrelated offense. While in jail, Ms. Carruthers encountered the Defendant who "wanted [her] to sign a piece of paper saying that" the statement Ms. Carruthers gave to the police was false. When Ms. Carruthers refused, the Defendant acted like she was going to fight Ms. Carruthers before running and pressing "the button," informing the guards that Ms. Carruthers had been "bothering her."

Thomas Jefferson Jones testified that, in April 2016, he was the Defendant's boyfriend and stayed at her house most of the time. According to Mr. Jones, he arrived at the Defendant's house around 4:30 or 5:00 p.m. on the afternoon of March 31; they were "at the house just doing what normal people do," such as watching television; and no arguments took place. Mr. Jones claimed that they did not start drinking until around 8:00 or 8:30 p.m. "when [they] went over to where [the Defendant's] daughter was at." Mr. Jones averred that he did not see Ms. Carruthers during that time frame, that he was unaware that the Defendant ever left to buy liquor, and that he did not see "any sort of dark liquor."

Mr. Jones also testified that William Fayne, a.k.a. "Bo Diddly," came by the Defendant's house that evening with some liquor. In addition, Jessica Cunningham, the

Defendant's daughter, and her friend, Ashley Bland, stopped by the residence. Mr. Jones admitted that he and the Defendant were consuming alcohol and using cocaine that night. According to Mr. Jones, the children did not arrive at the house until about ten to fifteen minutes before midnight.

Mr. Jones confirmed that, after the children were dropped off that evening, he and Mr. Fayne went to the ATM to withdraw money for crack cocaine. Ms. Cunningham also accompanied them to the ATM, and she gave the Defendant forty dollars when they returned home. According to Mr. Jones, he tried to get the Defendant "to use her money to get some food, because there wasn't no [sic] food in the house, and she knew the kids was [sic] going to be there." However, according to Mr. Jones, the Defendant wanted him "to call the dope man," which he did. Mr. Jones stated that the Defendant bought two rocks of cocaine and that she shared them with Mr. Jones and Mr. Fayne.

Thereafter, things "went haywire," according to Mr. Jones. He maintained that the Defendant spontaneously went into the kitchen and got some lighter fluid, then set "a little old loveseat" on fire in the living room. According to Mr. Jones, the Defendant said, "You must think I'm playing," before she lit the lighter fluid. Mr. Jones used his beer to put out the fire. After Mr. Jones put the fire out, he sat back down on the couch. He claimed that there "was no flame" or "fire left." Mr. Fayne jumped up and inquired "what the H is wrong with this woman." Mr. Jones responded, "I don't know, but it's time for us to go." They left. Mr. Jones estimated that he learned that the Defendant's house was on fire about twenty or twenty-five minutes after they left.

In addition, Mr. Jones testified about a conversation that he had with the Defendant a few days before the fire. At that time, they discussed that the Defendant was behind on rent, in the range of $900 to $1,000. According to Mr. Jones, the Defendant said that, "as long as she had been with Housing Authority, she [would] burn it down before she [would] leave."

Mr. William H. Fayne, Jr., testified that he "hooked up" with Mr. Jones "early in the evening," that he had two bottles of vodka, and that they "had a couple drinks." Mr. Fayne recalled going to the ATM that night with Mr. Jones and another individual. He remembered that he got money, which he gave to Mr. Jones to buy drugs. In addition, Mr. Fayne said that "the babies" were there that evening, but he was unsure where they were when he returned from the ATM.

Regarding the fire, Mr. Fayne described the following events: "I seen [sic] her put lighter fluid on the sofa and set it on fire. . . . I was shocked. I didn't believe anything like that." He recalled that the Defendant sprayed lighter fluid on the sofa where Mr. Jones was sitting, that she lit the lighter fluid with a cigarette lighter, that Mr. Jones poured his beer on the fire, and that the fire "was just smoking a little bit" after that. Mr.

Fayne did not remember any "arguing or fighting" between the couple that evening prior to this happening, and it appeared that the Defendant became angry without any provocation. Mr. Fayne was "almost sure everybody was drinking" that night, "just having a good time." He admitted that they were smoking crack cocaine.

According to Mr. Fayne, he and Mr. Jones left the residence immediately after the incident. In addition, Mr. Fayne testified that he observed the Defendant putting more lighter fluid on the sofa as Mr. Jones was exiting the residence. Mr. Fayne believed that only about five minutes elapsed before he saw smoke coming from the Defendant's residence and that only about another two minutes passed before the fire department arrived.

The Defendant gave various conflicting statements both on the scene and in the days following the fire. Initially, on the scene, at some point after Officer Perry pulled the Defendant to the front of the residence, the Defendant said to Captain Travis "that her boyfriend kicked in the back door, sprayed lighter fluid in the kitchen, and set it on fire." However, Captain Travis found the Defendant's explanation implausible. Captain Travis explained, "[T]here was little or no fire in the kitchen, and it's got a smoke line down about half way down the room. But there was no flames spread to the kitchen at all. . . . What she was telling me happened didn't match my experience doing fire investigation." Captain Travis also noted that "[t]he most significant damage to the structure was in the living room," which led to his "initial opinion" that the fire started in that room.

Moreover, Officer Covington testified that he, along with Officer Perry, had previously been involved in trying to kick open a door of "similar strength" to the Defendant's. Officer Covington explained: "We kicked on this door with our f[ee]t, probably [fifteen], [twenty] minutes with no success. We kicked a dent into the door, and it was still secure." Officer Perry testified that the Defendant's residence had "steel doors with steel frames" and a concrete wall. Officer Perry maintained that, on a separate occasion, it took him and another officer twenty minutes to kick in "a steel door with a wood frame." Officer Perry explained that the concrete wall made the Defendant's door "a lot stronger than the door" he had previously encountered.

In addition, Captain Travis testified that a smoke detector was recovered from a dresser drawer in the other bedroom. However, "[t]he electrical connection box was [still] in the ceiling of that bedroom." Due to the circumstances of this case, the grave nature of the injury to the children, and the accusation the Defendant made against Mr. Jones, Captain Travis recommended that the Tennessee Bomb and Arson squad handle the investigation.

The Defendant was taken by helicopter to the Progressive Care Unit at Regional One Health in Memphis. Registered Nurse Corie Dillie treated the Defendant for the

burns she suffered "to her chest, back, head, face, and ears." According to Nurse Dillie, on the morning of the Defendant's admission, the Defendant told her what happened:

> She said that her boyfriend put gasoline on her and tried to set her on fire.
>
> . . . .
>
> It was basically she was saying that they were having a disagreement and that . . . basically that he was abusive to her and that he was . . . trying to harm her. And that her grandchildren were, in fact, in the house, and she didn't know what had happened to them.

Nurse Dillie thought "it was a strange story, because there was no emotion involved in it at all."

That same day, the Defendant was interviewed at the hospital by Steve McClure, a fire investigator with the State of Tennessee Department of Commerce State Fire Marshal's Office. Investigator McClure first advised the Defendant of her Miranda rights before the Defendant relayed the following version of events:

> She advised . . . that she was just fixing the grandkids something to eat. She went in the living room and next thing she knows, there's a fire in the kitchen. And I explained to her that I knew that wasn't true.
>
> . . . .
>
> And I said, so I know this is very, very hard for you, but if you want to tell me the truth, you need to just tell me the truth.
>
> . . . .
>
> She said that—she started crying, and she said that she tried to get . . . kids out. . . . [S]he said, I took lighter fluid, he was sitting on the loveseat, sprayed it on the back and set it on fire. She said but he put it out. He put it out and then he left.

The Defendant explained that she used "charcoal lighter fluid." When Investigator McClure asked the Defendant if she "set the fire on purpose," the Defendant responded affirmatively.

Nurse Dillie testified that the Defendant later told her a different story. This time the Defendant claimed that she had been cooking in a toaster oven that caught "on fire

and that there was an explosion and that chemicals exploded in her kitchen and the windows had gotten . . . busted out. So basically, like, there was some type of explosion."

According to Nurse Dillie, the Defendant was prescribed oxycodone, fentanyl, and morphine during her hospital stay. In addition, Nurse Dillie confirmed that the Defendant tested positive for cocaine upon admission to the hospital, despite the fact that the Defendant denied using street drugs or intravenous drugs.

The Defendant gave another statement to police on April 5, 2016. After being advised of her rights, the Defendant averred the following:

> Jessica brought the kids over around 12:00 midnight. I cooked one of them a burger and gave the little one a bath. Thomas and Bo Diddly were there. Jessica brought Amsterdam that was already opened. I think something was in there. I got mad at Thomas, because I told him I needed help, and he didn't help. I went and got the lighter fluid from under the cabinet and squirted it on the back of the couch. I lit it with my lighter. Thomas put it out, and I made them leave.
>
> They were gone for about [ten] minutes. When I sat down on my computer chair . . . I smelled smoke. The couch caught fire. I went to the kitchen and got water, but the smoke was too bad. . . . I tried to open the door, and tried to get to my grandkids. I don't remember nothing [sic] else. Jessica did not bring anything for the kids. She is trying to get her life together.

After the Defendant was released from the hospital on April 25, 2016, she was held at the Tipton County Jail. While there, the Defendant gave yet another police statement on April 28, 2016. This time she averred the following:

> Didn't want Jessica and Sterling Brown, Jr. at her house. Jessica left the girls at the house. She was at Ashley's house all day. Jessica wanted money and knew her check would hit on the [first] at midnight. Me and Thomas went to Ashley's, and when we returned. Bo Diddly was at my house . . . . Ashley had given me some Absolute vodka in a cup. Jessica told me she put cocaine in my drink. She pulled powder out of her bra. Bo Diddly was at the house. He had Jack Daniels, and we had some drinks and beer. Jessica went to go to get her money around 12:00 midnight. The kids came with Jessica and Ashley and gave me [forty dollars]. Jessica changed clothes. Thomas and Bo Diddly started talking. I felt they were talking about drugs. I told them that that wasn't going on in my house.

I began to cook hamburgers for [the older child]. I had given her a bath. The fire started in the kitchen. Smoke was dark black. I went out the back door and tried to go back in. The smoke was too thick. I don't remember nothing [sic] else until the helicopter. I was mad at Thomas and Bo Diddly that day. I squirted lighter fluid, and it lit, but Thomas put it out. That's when I made them leave.

The Defendant signed this summary of her interview. The interview was also video-recorded, and a portion was played for the jury.

Also while in the jail, the Defendant was treated by Registered Nurse Victoria Cook. On one occasion when the Defendant was being undressed for wound care, the Defendant told Nurse Cook how she received the burns:

She said that . . . her daughter had dropped the kids off, and she had bathed them and put them to bed. And she knew the oldest one was hungry, because . . . they hadn't been fed. So she bathed them, put them to bed, and then started preparing food on the hot plate, and it must have caught fire. And that she had sustained her burns by going head first to— twice try and retrieve the children.

In addition, the Defendant informed Nurse Cook that she had cocaine in her system that night because she drank some vodka her daughter had brought to her house and that she drank it before her daughter told her that it "cocaine in it."

The medical examiner testified that both children died from "carbon monoxide toxicity and smoke inhalation" and that the manner of death was homicide. Moreover, according to the medical examiner, both children were well-formed, well-nourished, and healthy prior to the fire. In addition, there was no evidence of physical or sexual abuse.

Ryan Shanklin, an investigator and canine handler with the State Fire Marshal's Office, Fire Investigation Division, testified that he was called to the scene with his canine that was trained to detect accelerants to investigate the fire. According to Investigator Shanklin, his canine alerted in the living room of the home "where the couch" had been located and again at "a hole that had been patched on [the] wall right directly behind the couch." Based on the dog's indications, samples were taken from the living room area and from the hole in the wall. Analysis of the concrete chips collected at the scene "revealed the presence of medium petroleum distillate. Products in this range include but are not limited to mineral spirits, some paint thinners, some charcoal starters, dry cleaning solvents, some torch fuels, some solvents for insecticides and polishes, and some lamp oils."

Investigator McClure was qualified as an expert in the field of the "origin and cause of fire." He determined that the fire did not reach the kitchen area, but it instead originated in the living room, more specifically with "the small couch or loveseat." He was also able to determine that some type of accelerant was used to start the fire. Investigator McClure observed spalling, or damage to the concrete, on the floor of the living room between where the couch and loveseat sat, which was "a separate and distinct [pour] pattern that appear[ed] to be an ignitable liquid." According to Investigator McClure, although this spalling pattern was separate and distinct from any fire on the loveseat, it "corroborate[d]" the story "about the love seat being poured with lighter fluid." Investigator McClure stated, "I ruled this fire incendiary based on all available material, witness interviews, fire department statements and evidence, K-9 everything together that was available at the time." Finally, Investigator McClure did not "have any sort of timeline as far as how long from when the fire started to when the 911 call occurred," stating that such a determination would be "too subjective."

The Defendant testified in her own defense. She stated that she was watching television with Mr. Jones on March 31, 2016, and that they did not start drinking until approximately 9:00 p.m. She denied ever encountering Ms. Carruthers or going to the liquor store.

According to the Defendant, she went to Ms. Bland's house looking for her daughter to tell her not to bring the children over because the Defendant was being evicted the next day for non-payment of rent. The Defendant claimed that, while she was at Ms. Bland's, her daughter laced her drink with cocaine, stating, "So she poured the drink, and right afterwards she said, Mom sorry I didn't tell you. And she pulled powder cocaine out of her bra and told me she had added some with that. It was too late then. I had drank it."

The Defendant explained that she needed Mr. Jones and her daughter's help to move. The Defendant stated that she planned on moving in with her mother after the eviction. However, she learned that her daughter was going to move in with Ms. Bland and would not be moving with the Defendant to the Defendant's mother's house.

At some point, the Defendant and Mr. Jones returned to the Defendant's residence. According to the Defendant, Mr. Fayne was sitting on her porch when they returned. The Defendant said that the three of them went inside and began drinking and watching television. Then, around 11:45 p.m., the Defendant's daughter arrived with the children. When everyone left to go to the ATM, the Defendant fed and bathed her grandchildren. She testified, "And I gave my granddaughter a piece of prior cooked hamburger warmed up, and laid them down for bed . . . and they went to sleep." The children were asleep when everyone returned from the ATM. The Defendant's daughter gave her forty dollars and left.

The Defendant testified that Mr. Jones and Mr. Fayne stayed at the house for a while. The Defendant claimed that she did not see or use any crack cocaine that evening. Suspicious that the men were about to use cocaine, she asked them to leave. She was frustrated because Mr. Jones was supposed to help her move, rather than "have a house party." The Defendant testified that, when she saw Mr. Jones looking at her "in a very angry manner," she went and got "what was left of a can of charcoal lighter fluid" and put fluid on the loveseat where Mr. Jones was sitting. She claimed that only "some drops" came out of the can before she "struck the lighter" on the loveseat. According to the Defendant, she never saw any flames, just smoke after Mr. Jones put the fire out with his beer. The Defendant said that she did not see singe marks on the loveseat, and she believed that the fire had been extinguished when Mr. Jones and Mr. Fayne left.

The Defendant averred that, after the men left, she went in the kitchen and fixed herself a hamburger. The Defendant stated that it was common for her to go outside and smoke in the evening. She testified, "To my recollection, when I saw the flames is when I came back into the house from smoking and went to the living room, and everything was ablaze." She claimed that she tried multiple times to get her grandchildren in the back bedroom but was unable to reach them due to the heat and flames.

The Defendant testified that, when she set the loveseat on fire, she was only trying to "[i]ntimidate Thomas Jones to leave, with no intentions of hurting anyone." She explained that Mr. Jones was very abusive and that she just wanted him to leave. She claimed that it was never her "intention that evening to have anything catch fire[.]" According to the Defendant, she never intended to harm Mr. Jones or have the house burn down.

However, on cross-examination, the Defendant affirmed that, when she put lighter fluid on the loveseat and lit the fluid, she knew "there would be some" fire, but she was not "expecting a big fire." She also claimed to have no recollection of many of the details surrounding the various statements she made after the fire. In addition, she denied that she had used cocaine that evening or had been asking for the "dope man."

The Defendant also called Stuart Bayne, an independent fire investigator with forty-four years of experience. Mr. Bayne was recognized as an expert in the "field of fire investigation and causation." Mr. Bayne gave a summary of the fire at the Defendant's apartment:

> In the Shoaf Street event, ignition, growth, ignition on the loveseat, growth on the loveseat, extension to the couch, extension to the coffee table, and at some point there was an insufficient supply of air which caused this fire to deplete essentially, to lose its heat release rate.

[The Defendant] opened the door, the back door or the front door. Don't know. Likely the back door. And because the fire was decaying over time in the living room and fresh air came, the fire regained growth. And as the fire regained growth and strength, temperature, heat-release rate went up, fire spread began to go, ceiling collapsed, windows broke, and by the time the fire department got there, the fire department described it as fully involved, whereas the facts are, this was a long-duration fire, a relatively long-duration fire.

Mr. Bayne concluded that this fire "was not noticeably accelerated by [an] ignitable liquid" when discussing the spalling pattern on the living room floor. Moreover, Mr. Bayne explained that this fire "had to take time," being "likely anywhere from a [fifty] or [sixty] to [seventy] or [eighty]-minute fire."

In addition, Mr. Bayne testified that "[l]oveseats and couches have a notorious reputation for not being put out well. And it's very difficult to completely extinguish, even if it looked out." According to Mr. Bayne, it "could have taken . . . more than several minutes to see visible flames" from the loveseat.

On cross-examination, Mr. Bayne acknowledged that the Defendant's trial testimony was "not consistent with [his] version" of how the fire started and spread. Mr. Bayne said, "[T]he evidence at the scene is clear that [the Defendant] could not have been inside that structure during fire growth, so she wasn't cooking no [sic] hamburgers. Forgive me." Mr. Bayne opined that the Defendant had to have left the residence for a period of time.

After the conclusion of the proof, the jury found the Defendant guilty as charged. The Defendant was sentenced to life imprisonment for each of the felony murder convictions, fifteen years for each of the aggravated arson convictions, fifteen years for each aggravated child neglect convictions, and three years for aggravated assault. The two arson convictions were merged with one another as evidenced by the notation on the judgment form for Count 4. In addition, the two judgment forms for first degree felony murder reflect that those life sentences are concurrent with a separate, unrelated Tipton County case. The judgment forms are silent in all other regards regarding the consecutive or concurrent nature of the Defendant's various sentences.[1] By default, all sentences are concurrent pursuant Tennessee Rule of Criminal Procedure 32(c), and the Defendant's effective sentence is life imprisonment.

---

[1] The State asserts that all sentences were ordered to be served concurrently. However, we do not have the sentencing hearing included in the appellate record.

ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain her convictions and that the trial court erred in declining to give a lesser-included offense instruction on setting fire to personal property or land, or its attempt. The State responds that the evidence is sufficient to support the convictions and that the trial court properly denied the Defendant's lesser-included offense request instruction. Upon review, we agree with the State.

I. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the convicting evidence supporting her convictions. An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Without any citation to authority or reference to the record, the Defendant submits that "the State failed to prove each element of her charged crimes beyond a reasonable doubt" because the State "did not negate the fact that fire rekindled by accident as proffered by her expert." This argument fails to meet requirements of Tennessee Court of Criminal Appeals Rule 10(b): "Issues which are not supported by argument, citation to authorities, or appropriate reference to the record will be treated as waived in this court." See also Tenn. R. App. P. 27(a)(7)(A).

In any event, for purposes of this case, a person commits aggravated arson when she "knowingly damages any structure by means of a fire . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein," and "[w]hen one (1) or more persons are present therein[,]" or "[w]hen any person . . . suffers serious bodily injury as a result of the fire or explosion." Tenn. Code Ann. §§ 39-14-301(a)(1), -302(a)(1) & (2). There is no requirement that the person or persons present be injured or that the property actually be destroyed. State v. Lewis, 44 S.W.3d 501, 508 (Tenn. 2001). Further, arson is not a "result-of-conduct" offense. In other words, it does not "require that a defendant act with an awareness that setting a fire or creating an explosion is reasonably certain to cause damage to a structure." State v. Gene Shelton Rucker, No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *10 (Tenn. Crim. App. Dec. 9, 2004), perm. app. denied (Tenn. Mar. 21, 2005). Rather, "the nature of the conduct—creating a fire or explosion—that causes the damage to the structure is consequential and central to the offense." Id. Thus, the knowing mens rea is satisfied where "the person is aware of the nature of the conduct" or the accompanying circumstances. Tenn. Code Ann. § 39-11-302(b); see Rucker, 2004 WL 2827004, at *10.

According to the Defendant, the fire rekindled by accident as testified to by her expert. In essence, the Defendant's is arguing that she did not knowingly cause damage to the residence owned by the Housing Authority. We disagree.

Here, the proof in the light most favorable to the State showed that the Defendant, who had been drinking and using drugs, intended to set the loveseat on fire. Her boyfriend, Mr. Jones, was sitting in the chair, and she wanted him to leave. She poured lighter fluid on the chair and said, "You must think I'm playing," before she lit the lighter fluid. The Defendant knew her grandchildren were asleep in the house when she set the fire. The children were found inside the house, and resuscitative efforts failed.

In addition, Mr. Jones testified about a conversation he had with the Defendant the Wednesday before the fire. According to Mr. Jones, they discussed the fact that the Defendant was behind on rent, and the Defendant said that, "as long as she had been with Housing Authority, she [would] burn it down before she [would] leave." Mr. Fayne testified that he observed the Defendant putting more lighter fluid on the sofa as Mr. Jones was exiting the residence. Mr. Fayne believed that only about five minutes elapsed before he saw smoke coming from the Defendant's residence.

Finally, the Defendant's expert, Mr. Bayne, testified that this fire "was not noticeably accelerated by [an] ignitable liquid" when discussing the spalling pattern on the living room floor. Whereas, the State's expert, Investigator McClure testified that the spalling pattern was "a separate and distinct [pour] pattern that appear[ed] to be an ignitable liquid." According to Investigator McClure, although this spalling pattern was separate and distinct from any fire on the loveseat, it "corroborate[d]" the story "about

-14-

the love seat being poured with lighter fluid." Regardless, the Defendant's expert acknowledged that the Defendant's trial testimony was "not consistent with [his] version" of how the fire started and spread, and he opined that the Defendant had to have left the residence for a period of time due to the duration of the fire. How the fire was started was an issue of fact to be decided by a jury, and it was within the jury's purview to credit or discredit the testimony of the experts who stated that it was started intentionally or otherwise. See State v. Colvett, 481 S.W.3d 172, 198 (Tenn. Crim. App. 2014).

The evidence was sufficient to support for the jury's finding that the Defendant knowingly started the fire on the loveseat. Notwithstanding, the Defendant's alleged belief that the fire on the loveseat had been extinguished before rekindling does not negate her culpability for setting the fire in the first place. See State v. Michael A. Virga, No. M2008-00209-CCA-R3-CD, 2009 WL 537560, at *12 (Tenn. Crim. App. Mar. 3, 2009) (rejecting the defendant's argument that the fire was accidental).

## II. *Jury Instruction*

The Defendant contends that the trial court erred in instructing the jury on aggravated arson because the jury was not instructed on the offense of setting fire to personal property or land, or its attempt, as a lesser-included offense. The trial court relied on Rucker, wherein this court has previously determined that setting fire to personal property or land is not a lesser-included offense of arson. See 2004 WL 2827004, at *8-9; see also State v. Dorris Lee Markum, No. M2004-02884-CCA-R3-CD, 2006 WL 407770, at *4 (Tenn. Crim. App. Feb. 17, 2006). We decline the Defendant's invitation to revisit this precedent. Accordingly, this issue is without merit.

## CONCLUSION

Based upon the foregoing, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-15-